STATE OF NORTH CAROLINA v. PERRIE DYON SIMPSON

No. 43A93

(Filed 8 September 1995)

### 1. Jury § 151 (NCI4th)— first-degree murder—jury selection—questions concerning automatic death penalty—objections sustained

The trial court did not err during jury selection for a first-degree murder by sustaining the State's objections to questions purportedly designed to identify any prospective jurors who would automatically vote for the death penalty when the murder was premeditated. Each seated juror, through individual, sequestered examination, was made abundantly aware of the nature of the proceedings; that the issue of defendant's guilt had

STATE v. SIMPSON

[341 N.C. 316 (1995)]

been established with his plea of guilty to first-degree murder; that the jury would decide the sentence to be imposed with the only options being life imprisonment or the death penalty; and further that each juror understood the sentencing process, including the finding and weighing of aggravating and mitigating circumstances. The majority of defendant's questions to which objections were sustained were argumentative, were incomplete statements of the law, or were impermissible staking-out questions, and, while the prospective jurors were not allowed to say how they would deal with "premeditated murder," they were required to state whether they could consider both a sentence of life imprisonment and a sentence of death with respect to first-degree murder. Each individual juror answered affirmatively and positively that he or she could consider a sentence of life imprisonment in this first-degree murder case. While some of the questions which defendant attempted to ask were proper, any error in excluding them was rendered harmless through the examination by the trial court, the State and further examination by the defendant. The *voir dire* in the instant case was fully sufficient to serve its purpose of enabling counsel for the State and the defendant to determine whether grounds existed for challenge for cause and to exercise peremptory challenges intelligently.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

2. **Jury § 151 (NCI4th)— first-degree murder—jury selection—whether jurors could properly consider aggravating and mitigating circumstances—objections sustained**

There was no error during jury selection in a first-degree murder prosecution where defendant contended that the trial court erred by sustaining objections to a variety of questions to potential jurors on *voir dire* relating to whether they could properly consider aggravating and mitigating circumstances. The majority of the questions were properly disallowed as to form as attempts to stake out or determine what kind of verdict a juror would render under certain named circumstances not yet in evidence. Assuming that some of the questions should have been allowed, any error in excluding them was harmless beyond a reasonable doubt. The trial court permitted adequate leeway in sufficient

STATE v. SIMPSON

[341 N.C. 316 (1995)]

areas of questioning to enable defendant to discern any prospective juror who harbored a latent bias against any type of evidence which defendant proposed to present in mitigation.

**Am Jur 2d, Jury §§ 206, 208.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

3. **Jury § 223 (NCI4th)— first-degree murder—jury selection—excusal for cause—opinions about death penalty**

There was no error in jury selection in a first-degree murder prosecution where defendant contended that the excusal of five potential jurors for cause deprived him of his right to a fair and impartial jury in that the jurors' answers showed that they did not meet the standard for excusal under *Wainwright v. Witt*, 469 U.S. 412. It is abundantly clear from the responses of each potential juror that their personal beliefs substantially impaired their ability to follow the law under the *Witt* standard, and the court correctly allowed the challenge as to each for cause.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

4. **Criminal Law § 683 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—lack of prior criminal activity**

The trial court did not err during a first-degree murder sentencing hearing by not peremptorily instructing the jury on the statutory mitigating circumstance that defendant had no significant history of prior criminal activity where the record reveals previous criminal convictions of carrying a concealed weapon, contributing to the delinquency of a minor, and larceny. Considering the nature of the offenses and the age of the acts, the jury had ample basis to find that defendant's prior criminal activity was significant.

**Am Jur 2d, Criminal Law § 599.**

**5. Criminal Law § 681, 682 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—mental or emotional disturbance—impaired capacity**

The trial court did not err during a first-degree murder sentencing hearing by not peremptorily instructing the jury on the statutory mitigating circumstance that defendant was under the influence of a mental or emotional disturbance and whether defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Although defendant maintained that the testimony of his psychological expert and his evaluation at Dorothea Dix Hospital point without contradiction to the conclusion that these two mitigating circumstances exist, defendant's written confession shows he was able to contemplate and plan the robbery and murder over a two-day period; he waited until dark to approach the house; once inside, he instructed that the drapes be closed and that the telephone lines be cut; he was able to select and choose his various murder weapons; defendant's psychological expert indicated on cross-examination that defendant's actions showed a plan rather than impulse; the diagnosis of Attention Deficit/Hyperactivity Disorder was made several years after the murder and at least three other mental health professionals who evaluated defendant did not share the opinion that he had ADHD; and defendant conceded that his evidence shows that he had the capacity to understand the wrongfulness of his conduct and requested that only his capacity to conform his conduct be submitted.

**Am Jur 2d, Trial §§ 1077 et seq.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**6. Criminal Law § 680 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—age of defendant**

The trial court did not err in a sentencing hearing for a first-degree murder by not giving a peremptory instruction on the mitigating circumstance of the age of defendant where defendant was 21 at the time of the murder, soon to become a father, had held several employment positions, had a criminal background, and was over the age of majority. If found from the evidence and evaluated in light of all the facts and circumstances, a reasonable

juror could conclude that the defendant was immature or that he was mature beyond his years.

**Am Jur 2d, Trial §§ 1077 et seq.**

**7. Criminal Law § 680 (NCI4th)— first-degree murder—sentencing—nonstatutory mitigating circumstances—peremptory instruction denied**

The trial court did not err in a sentencing proceeding for first-degree murder by refusing to peremptorily instruct the jury upon nonstatutory mitigating circumstances. Jurors must remain free to assign no mitigating value to a nonstatutory mitigating circumstance should they so choose, even if they find that the circumstance exists; defendant's proposed instruction requires jurors to assign some amount of mitigating value to the nonstatutory mitigating circumstances.

**Am Jur 2d, Trial §§ 1077 et seq.**

**8. Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing—instructions—mitigating weight**

The trial court did not err in a first-degree murder sentencing hearing by declining to instruct the jury that statutory mitigating circumstances proven by a preponderance of the evidence must be given some mitigating weight. The instructions given by the trial court imparted in substance the essence of defendant's proposed instruction and are identical to instructions previously found to be free from error.

**Am Jur 2d, Trial §§ 1077 et seq.**

**9. Criminal Law § 1362 (NCI4th)— first-degree murder—sentencing—instructions—age of defendant**

The trial court did not err in a first-degree murder prosecution by refusing to give an instruction proffered by defendant on the statutory mitigating circumstance of age. Rather than encouraging the jury to look at varying conditions and circumstances in its consideration of whether the defendant's age is mitigating, defendant's proposed instruction more narrowly defined age by confining consideration to only mental and emotional age along with chronological age. The trial court correctly declined to give the instruction inasmuch as the proffered instruction dictated a set formula for determining whether defendant's age had mitigat-

STATE v. SIMPSON

[341 N.C. 316 (1995)]

ing value. The instruction given informed the jury that the mitigating effect of age is to be considered in light of all the facts and circumstances found from the evidence, and permits the jury to consider such factors as defendant's mental and physical maturity, experience, and prior criminal history as well as chronological age in determining whether age is mitigating.

**Am Jur 2d, Trial §§ 1077 et seq.**

**10. Criminal Law § 1314 (NCI4th)— first-degree murder—sentencing—mitigating evidence excluded**

There was no error in a first-degree murder sentencing hearing where the trial court excluded testimony concerning defendant's placement in the foster-care system and his biological parents' refusal to allow his adoption into a permanent and stable family. The reasoning behind defendant's continued placement in the foster-care system, that his parents refused to allow his adoption, is irrelevant to defendant's sentencing proceeding; what is of import, however, is the effect this continued placement had upon defendant's life. One or more jurors found as a nonstatutory mitigating circumstance that "the defendant's development was adversely affected by the lack of permanence in his life that was the result of frequent changes of placement in different foster homes and frequent changes in schools." This circumstance was found from evidence before the jury and reflects the relevant fact of how the lack of permanence in defendant's life negatively affected him.

**Am Jur 2d, Criminal Law § 598, 599.**

**11. Criminal Law § 1310 (NCI4th)— first-degree murder—sentencing—mental or emotional disturbance—expert evidence excluded**

The trial court did not err in a first-degree murder sentencing proceeding by not allowing a social worker to render an expert opinion on defendant's emotional or mental disturbance where the excluded evidence would have been merely cumulative. Since defendant successfully elicited the same testimony through another witness clearly qualified in the field, any error in excluding this testimony was harmless.

**Am Jur 2d, Appellate Review § 759; Criminal Law §§ 598, 599.**

STATE v. SIMPSON

[341 N.C. 316 (1995)]

**12. Criminal Law § 1310 (NCI4th)— first-degree murder—sentencing—rebuttal testimony limited—cumulative**

There was no error in a first-degree murder sentencing hearing where defendant contended that he was not allowed to present evidence in rebuttal to the State's contentions that defendant was an aggressive and dangerous person. Although a social worker was not allowed to testify that she was not afraid or fearful when she was with defendant, she was allowed to give testimony from which it was clear that she was not only unafraid of defendant, but rather enjoyed his company.

**Am Jur 2d, Appellate Review § 759; Criminal Law §§ 598, 599.**

**13. Criminal Law § 1309 (NCI4th)— first-degree murder—sentencing—excluded testimony**

The trial court did not err in a first-degree murder sentencing hearing by not allowing defendant's expert witness to testify concerning her opinion as to whether most people who commit violent crimes suffer from mental or emotional disorders. Whether or not other defendants or criminals in general suffer from mental or emotional disorders has no relevance to the jury's determination of this particular sentence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**14. Criminal Law § 1310 (NCI4th)— first-degree murder—sentencing—cumulative evidence**

The trial court did not err in a first-degree murder sentencing hearing by not allowing defendant's expert to testify as to what the proper treatment for defendant's Attention Deficit/Hyperactivity Disorder would be. Any error was harmless beyond a reasonable doubt since the excluded evidence would have been cumulative.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**15. Criminal Law § 1314 (NCI4th)— first-degree murder—sentencing—codefendant's sentence**

There was no error in a first-degree murder sentencing hearing where the trial court disallowed evidence that defendant's accomplice received a life sentence. A jury is not entitled to consider as mitigating a codefendant's sentence for the same offense.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**16. Criminal Law § 1316 (NCI4th)— first-degree murder—sentencing—robbery as aggravating circumstance—robbery sentence not allowed as mitigating circumstance**

There was no error in a first-degree murder sentencing hearing where the State was allowed to argue that the jury should weigh his conviction of robbery with a dangerous weapon as an aggravating circumstance but defendant was not allowed to show in rebuttal that he received a forty-year sentence. *Simmons v. South Carolina*, 129 L. Ed. 2d 133, does not require the reversal of *State v. Robinson*, 336 N.C. 78.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

**17. Evidence and Witnesses § 2296 (NCI4th)— first-degree murder—sentencing—defendant's mental health—reliance on reports of others**

There was no error in a first-degree murder prosecution where the trial court allowed the State to cross-examine defendant's expert concerning the diagnosis of other mental health professionals. Under N.C.G.S. § 8C-1, Rule 705, and pursuant to *State v. Allen*, 322 N.C. 176, the witness was properly cross-examined about other diagnoses contained within psychiatric reports upon which she relied, although she ultimately formed a differing diagnosis.

**Am Jur 2d, Expert and Opinion Evidence §§ 212, 227-255.**

**18. Criminal Law § 1326 (NCI4th)— first-degree murder—sentencing—instructions—reasonable doubt and preponderance of the evidence**

The trial court did not err in a first-degree murder sentencing hearing by instructing the jury in accord with the pattern jury instructions with respect to aggravating circumstances and the statutory questions required for the death sentence, and on preponderance of the evidence with respect to mitigating circumstances. Although defendant contends that the sentence "Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you . . ." diminishes the State's burden of proof, the jury could not have viewed or construed the words "fully satisfies" in

such a manner as to lessen the State's burden of proof or leave the matter entirely to the subjective judgment of each juror. "By the preponderance of the evidence" is the correct burden of proof for establishing the existence of mitigating circumstances and the use of the word "satisfy" denotes a burden of proof consistent with a preponderance of the evidence.

**Am Jur 2d, Trial §§ 1370 et seq.**

**19. Criminal Law § 1343 (NCI4th)— first-degree murder—sentencing—especially heinous, atrocious, or cruel aggravating circumstance—not vague and overbroad**

The especially heinous, atrocious or cruel aggravating circumstance for first-degree murder is not vague and overbroad.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**20. Criminal Law § 1326 (NCI4th)— first-degree murder sentencing—instructions—mitigating circumstances**

There was no error in the use of the pattern jury instructions defining mitigating circumstances in a first-degree murder sentencing proceeding. The instruction did not improperly focus on matters which would reduce the culpability of the killing rather than focusing on both the killing and defendant himself.

**Am Jur 2d, Trial §§ 1237, 1250.**

**21. Criminal Law § 1321 (NCI4th)— first-degree murder—sentencing—instructions—failure to agree on sentence**

There was no error in a first-degree murder sentencing hearing where the trial court refused to instruct the jury that the court would impose a life sentence if the jury failed to agree on a sentencing recommendation. N.C.G.S. § 15A-2000(b).

**Am Jur 2d, Trial § 1445.**

**22. Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing—instructions—nonstatutory mitigating circumstances**

The trial court did not err in a first-degree murder sentencing hearing in its instructions on nonstatutory mitigating circumstances. The U.S. and N.C. Constitutions do not require that

jurors accept whatever a defendant chooses to proffer as being mitigating.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1077.**

**23. Jury § 141 (NCI4th)— first-degree murder—sentencing— jury selection—questions concerning parole eligibility**

There was no error in a first-degree murder sentencing proceeding where the trial court refused to allow defendant to question potential jurors on *voir dire* concerning their attitudes or understanding regarding parole eligibility and to inform potential jurors that defendant would be ineligible for parole for twenty-seven years.

**Am Jur 2d, Jury §§ 206, 207.**

**24. Criminal Law § 1371 (NCI4th)— first-degree murder—sentencing—proportionality review—not unconstitutionally vague and arbitrary**

The standards set for the proportionality review mandated by N.C.G.S. § 15A-2000(d)(2) are not vague and arbitrary. The makeup of the pool of cases used for review was first explained in *State v. Williams*, 308 N.C. 47 (1983), and the purpose, methodology and focus of the review was clarified there and more recently in *State v. Bacon*, 337 N.C. 66 (1994). Counsel for any capitally tried defendant should well know from the case law the manner in which proportionality review is undertaken.

**Am Jur 2d, Criminal Law §§ 628, 629.**

**25. Criminal Law § 1373 (NCI4th)— first-degree murder—not disproportionate**

A sentence of death for first-degree murder was not disproportionate where the jury's finding of each aggravating circumstance was supported by the evidence and the jury did not sentence defendant to death while under the influence of passion, prejudice, or any other arbitrary factor. Defendant schemed and plotted his attack upon an old and defenseless man who had welcomed defendant into his home and given him food and aid; defendant lurked outside the house waiting for night to fall before he forced his way inside and mercilessly terrorized and tortured a man who only the day before had tried to help him; and defendant's ability to appreciate the criminality of his conduct was not found to be impaired.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Davis (James C.), J., at a resentencing proceeding held at the 11 January 1993 Criminal Session of Superior Court, Rockingham County, upon defendant's conviction of first-degree murder. Heard in the Supreme Court 9 January 1995.

*Michael F. Easley, Attorney General, by Joan Herre Byers, Special Deputy Attorney General, for the State.*

*James R. Glover and Ann B. Petersen for defendant-appellant.*

LAKE, Justice.

This appeal marks the third time this case has been before this Court for sentencing review. The defendant, Perrie Dyon Simpson, confessed to the 27 August 1984 murder and robbery of Jean E. Darter, a ninety-two-year-old retired Baptist minister. On 4 March 1985, defendant entered pleas of guilty to the first-degree murder of Reverend Darter, robbery with a dangerous weapon, and conspiracy to commit murder. In the intervening years, defendant has received three capital sentencing proceedings pursuant to N.C.G.S. § 15A-2000, and each of the three juries, after hearing the evidence and arguments of counsel, has recommended a sentence of death.

Defendant appealed to this Court as of right from his first judgment and sentence of death, and he was allowed to bypass the Court of Appeals as to the judgments and sentences for the additional offenses. Upon review, this Court found no error in the judgments and sentences for robbery with a dangerous weapon and conspiracy to commit murder and found no error in the conviction of defendant for first-degree murder. However, this Court found prejudicial error in the capital sentencing proceeding and remanded to the trial court for a new sentencing proceeding for the first-degree murder. *State v. Simpson*, 320 N.C. 313, 357 S.E.2d 332 (1987), *cert. denied*, 485 U.S. 963, 99 L. Ed. 2d 430 (1988).

Following his second capital sentencing proceeding and the recommended sentence of death and judgment accordingly, defendant

again appealed as of right to this Court. Based on the ruling of the United States Supreme Court in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), this Court vacated defendant's sentence of death and remanded for a third capital sentencing proceeding. *State v. Simpson*, 331 N.C. 267, 415 S.E.2d 351 (1992).

At the third capital sentencing proceeding, as in the two previous proceedings, the State presented evidence tending to show that on 27 August 1984, ninety-two-year-old Reverend Jean E. Darter was murdered in his Reidsville home. Reverend Darter's daughter, Doris Darter Faircloth, testified she tried to telephone her father the night of his murder but was unable to reach him. Faircloth and her husband decided to drive to Reverend Darter's house, and when they arrived, they noticed that the only light turned on was in the bathroom. Mr. and Mrs. Faircloth unlocked the back door and went to the bathroom to see if Reverend Darter had fallen and hurt himself. He was not in the bathroom. Mrs. Faircloth went to her father's bedroom and saw him lying across the bed. "I knew that he was dead because he was so still." Mr. Faircloth turned the bedroom light on, and what they saw was "so horrible that I seemed not to be able to see it all collectively. I saw it in bits and pieces." Mrs. Faircloth noticed a strap around her father's neck, "and it was tied to the bedpost and then I looked at his eyes and by that time I said somebody did this to him." Because the telephone cords had been cut, Mr. and Mrs. Faircloth called the police from a neighbor's telephone.

Mrs. Faircloth testified her father was an avid gardener and at the age of ninety-two, was still very active. He continued to study and still preached occasionally. "His health was remarkable for his age. His mind was very alert." Reverend Darter wore glasses and had injured his back jumping out of a fishing boat a few years before his death. He wore a back brace to maintain his active life when his back gave him pain.

Detective Sergeant Ronnie Ellison responded to the Faircloths' call for help. When he entered Reverend Darter's house, he observed there were no signs of forced entry, and that the cords on the telephones in the hall and in the bedroom had been cut. Mobile Crime Laboratory Operator W.F. Lemmons with the State Bureau of Investigation ("SBI") identified, collected, and preserved evidence at the murder scene. He conducted a walk-through of the house to determine the housekeeping habits of Reverend Darter and to help identify anything out of place. Lemmons' inspection revealed that

although Reverend Darter kept the inside of the house neat and clean, in one bedroom, the sheets and covers were wadded up, the dresser drawers were pulled out, and the contents dumped onto the floor. He noticed there was a bundle of knives lying in the kitchen sink, and that both the freezer and refrigerator doors were cracked open. The food inside was beginning to thaw. In a room just off of the kitchen was a storage area where Lemmons found a carton of glass Tab bottles; one bottle was missing. In the bathroom, Lemmons observed a pack of razor blades in the sink. Lemmons also discovered a writing pad with the names "Lisa Marie Johnson" and "Curtis Anthony Parker" written on it.

In another bedroom, Lemmons found Reverend Darter lying on the bed, with his feet on the floor. Two belts were wrapped around Reverend Darter's neck. The outer belt was the largest and thickest, and it was tied to the bedpost. The inner belt was broken. Reverend Darter's face was bloated and bloody. He had glass in his left eye, and a design composed of many small circles and dots was imprinted on the Reverend's left cheek. Both of the Reverend's arms were cut open from his elbows to his wrists. Blood was on the bed and had run down the side of the bed and formed a puddle on the floor; there was blood on the walls and window blinds. Also on the bed were the contents of two dresser drawers, shattered glass, the Reverend's broken glasses, his false teeth, a razor blade, and the neck of a glass Tab bottle. Directly under Reverend Darter's elbow was a photo album entitled, "My Grandchildren."

Agent Walter L. House, also with the SBI, was a member of the Darter murder investigation team. He testified that the Faircloths turned over to him Reverend Darter's telephone bill. According to the bill, a long-distance telephone call had been made from Reverend Darter's house to a telephone in Greensboro on 26 August 1984. Agent House and Captain Eddie Lambeth determined the telephone number belonged to a woman named Ruby Locklear. House and Lambeth visited her and asked if she knew anyone in Reidsville. Locklear replied that the only person who ever called from Reidsville was a man named Perrie Dyon Simpson and that he called her when he wanted to reach his father. Agent House also testified that eight latent fingerprints found in the Darter house matched the defendant's.

The police learned there was an outstanding warrant for defendant in Greensboro for simple assault, so defendant was arrested on 21 September 1984. Defendant was advised of his *Miranda* rights and

agreed to talk with officers about the Darter murder. He signed a written statement to the effect that he had read about the Darter murder but knew nothing about it. Defendant stated he had never met or seen Reverend Darter and had never been inside Reverend Darter's house. Defendant was then transported to Greensboro for a bond hearing on the assault charge. In Greensboro, police asked defendant if they could talk some more about the Darter murder, and defendant agreed.

During this questioning period, defendant made a sixteen-page written statement confessing his involvement in the murder. Defendant confessed that on 26 August 1984, he and his pregnant, sixteen-year-old girlfriend, Stephanie Eury, went for a walk to look for some money. Stephanie went to the front door of Reverend Darter's house and rang the doorbell. She told Reverend Darter she was hungry, so he brought her a diet soft drink and gave the defendant a glass of milk. Stephanie asked if they could come inside, so the three went into the front living room. Stephanie told the Reverend that she and defendant were traveling to Florida and had gotten stuck in Reidsville. The Reverend suggested they contact the Salvation Army or the police. Stephanie asked Darter if he could give them some money, and Reverend Darter gave her four dollars, explaining that was all the money he had in cash. Defendant told police that he and Stephanie "noticed the preacher had a nice home." After getting permission to use the telephone, defendant called Ruby Locklear in Greensboro to see if she had seen defendant's father. When defendant got off of the telephone, he heard Stephanie tell the Reverend her name was "Lisa" and defendant's name was "Curtis Anthony." Defendant watched the Reverend write these names down on a pad of paper. Defendant told the police that before he and Stephanie left the house, the Reverend gave them some sponge cake and peaches to take with them. Defendant admitted that "Reverend Darter was real friendly to us and was very helpful."

The next day, 27 August 1984, defendant said that he and Stephanie "both talked about going back to preacher Darter's house to get some money. Stephanie and I decided we would go back to Darter's house and we would not come back empty-handed no matter what." Defendant told police that he and Stephanie walked around outside waiting for it to get dark. Once it was dark enough, the two walked to Reverend Darter's house, looking around to make sure no one saw them. They rang the doorbell, and when Reverend Darter answered the door, they forced their way inside. Reverend Darter ran to the telephone, but defendant "pulled the preacher's hands off the

telephone." Defendant told Stephanie to cut the telephone cords, and in the meantime, he was "struggling with Preacher Darter holding onto the preacher's arms to control him and force him back in his bedroom so he would tell me where some money was." Defendant held the Reverend down on the bed, with his hands around his neck, telling him he wanted money "or else," but the Reverend told defendant he did not have any money.

The Reverend told defendant that if he was killed, he knew he was going to heaven. Defendant told the police, "this frustrated me and I grabbed him tighter around the throat." Defendant reached across the bed and got a belt and "looped it around his neck and tightened the belt." While he held the belt tight, defendant rummaged through two dresser drawers Stephanie had dumped onto the bed. Not finding anything he wanted, defendant drew the "belt more tight around his neck and I told the preacher he had better tell us where some more money was but the preacher could not talk because he was choking." When the first belt broke, defendant got another, thicker belt "and looped this leather belt around the preacher's neck and tightened up on this leather belt. Then I called Stephanie to bring me something in the bedroom to kill this preacher with."

When defendant did not receive any weapon to his liking, he called for Stephanie to come and hold the belt while he "went in the kitchen and looked for some device to beat the old preacher and finish him off." He picked up a full pop bottle and then decided to put it back and get an empty bottle. He returned to the bedroom, pulled tight on the belt, and "hit the old preacher hard three times with this bottle and on the third blow the soft drink bottle broke." Defendant then decided to tie the end of the belt to the bedpost, and he went into the bathroom and got a double-edged razor blade. "I held this double-edged razor blade between my right index finger and right thumb and then I sliced the preacher's arms from the biceps all of the way down the under side of the forearms to the wrist. I cut both of the preacher's arms." Stephanie gathered a bag of food, a porcelain lamp, a radio, and boxes of Kleenex and packed them in a plastic laundry basket. "The last thing we did before leaving the preacher's house was to turn off all the lights except the bathroom light."

Agent House further testified that after defendant made his confession, defendant read the statement out loud checking for mistakes. When defendant came to a portion of the statement where he had used profanity, he laughed.

STATE v. SIMPSON

[341 N.C. 316 (1995)]

Pathologist Michael James Shkrum performed an autopsy on Reverend Darter and testified the Reverend sustained blunt-trauma injuries to his face causing swelling and bruising. The bone between the eye socket and the brain was fractured, the cheek and the jaw bone were broken, and the Reverend's tongue was torn. Strangulation bruises appeared on the neck. It was Dr. Shkrum's opinion that Reverend Darter died from ligature strangulation, and that it would have taken several minutes for his heart to stop beating. It was Dr. Shkrum's further opinion that Reverend Darter experienced pain. Dr. Shkrum also testified that because Reverend Darter sustained bruising around his face, his heart was still beating when those injuries were inflicted.

The defendant testified on his own behalf and presented evidence tending to show that after his birth, he went directly from the hospital into the foster-care system. Joan Landreth, a social worker, testified that the Guilford County Department of Social Services was granted custody of defendant when he was ten days old. Ms. Landreth was directly responsible for the defendant's placement when he was nine years old. She testified that by the time defendant reached the age of eighteen, he had been placed with a number of foster-care families. However, defendant's older brother, Daryl, continuously lived with their maternal grandmother, Althea Kermen. Ms. Landreth testified that defendant was allowed to visit with his grandmother and brother, but that Ms. Kermen repeatedly turned defendant back over to the care of the foster-care system. Throughout his childhood, defendant experienced problems with recurring skin rashes and slurred speech.

Dr. Claudia Coleman conducted a psychological examination of defendant and reviewed defendant's social history records compiled by the Department of Social Services ("DSS"). She testified that in her expert opinion, defendant suffered from severe mental and emotional disturbances. Specifically, Dr. Coleman diagnosed defendant as suffering from attention deficit/hyperactivity disorder ("ADHD") and from a "mixed personality" disorder. Dr. Coleman concluded that based upon the DSS records, defendant began to exhibit these mental and emotional disturbances at an early age, probably prior to his fifth birthday, and that the defendant's frequent movement between various foster families aggravated his ADHD. Further, Dr. Coleman testified that at the time of the murder, defendant had the emotional age of a twelve to fourteen year old, and that while defendant was able to plan the robbery and was aware that his actions were wrong, defend-

ant's disorders nevertheless left him without the capacity to stop his actions.

The jury found the existence of the two aggravating circumstances submitted: (1) the murder was committed by the defendant while he was engaged in the commission of a robbery; and (2) the murder was especially heinous, atrocious, or cruel. One or more jurors additionally found the following statutory and nonstatutory mitigating circumstances: (1) the murder was committed while defendant was under the influence of a mental or emotional disturbance; (2) defendant aided in the apprehension of another capital felon; (3) defendant's mental or emotional age at the time of the murder was mitigating; (4) defendant's development was adversely affected by the lack of permanence in his life as a result of the frequent changes in placement with foster-care families and schools; (5) defendant was taken from the care of his grandmother while his brother was allowed to remain in her care; (6) defendant experienced a mental or emotional disturbance at an early age; (7) defendant's mental or emotional disturbance affected his ability in school; (8) defendant's mental or emotional disturbance affected his ability to sustain employment; (9) defendant's behavior improved during times when he was in a structured environment; (10) defendant confessed to his involvement in the murder prior to his arrest; (11) defendant did not minimize his culpability in the murder; (12) defendant voluntarily consented to a search of his property for evidence of the robbery and murder; and (13) defendant voluntarily pled guilty to murder, armed robbery, and conspiracy to commit murder.

The jury found beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, and it further found that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. The trial court entered judgment in accordance with the jury's recommendation of death. It is from this judgment and commitment of death that defendant currently appeals. For the reasons stated herein, we conclude that the capital sentencing proceeding was free from prejudicial error and that the sentence of death is not disproportionate.

JURY SELECTION ISSUES

[1] In his first assignment of error, defendant contends the trial court committed reversible error and he was denied due process when the trial court, relying upon *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761

STATE v. SIMPSON

[341 N.C. 316 (1995)]

(1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983), sustained the State's objections to certain questions to prospective jurors purportedly designed to identify if any of them would always vote for the death penalty when the murder was premeditated. Defendant argues that this asserted prohibition violated *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992) and *State v. Conner*, 335 N.C. 618, 440 S.E.2d 826 (1994). In addition, defendant contends that the trial court abused its discretion by unduly restricting his ability to determine whether prospective jurors could properly consider aggravating and mitigating circumstances in accord with our law.

In *Morgan*, the United States Supreme Court in essence held that a defendant is entitled, upon request, to inquire of a prospective juror whether he or she would automatically vote for the death penalty. *Morgan*, 504 U.S. at 736, 119 L. Ed. 2d at 507. The Court further provided that general fairness and "follow the law" questions alone were insufficient to detect those jurors who would automatically impose the death penalty without regard for the evidence, noting that "[a]s to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed." *Id.* at 735, 119 L. Ed. 2d at 506. When such latent biases are unprobed and "even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.* at 729, 119 L. Ed. 2d at 503. However, we have held that such error is harmless where other questioning reveals, with sufficient specificity and assurance, whether the juror will consider mitigation and will consider both sentencing options. *See State v. Price*, 334 N.C. 615, 618, 433 S.E.2d 746 (1993), *sentence vacated on other grounds*, —— U.S. ——, 129 L. Ed. 2d 888, *on remand*, 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied*, —— U.S. ——, 131 L. Ed. 2d 879 (1995).

In *Conner*, decided subsequent to this third sentencing proceeding, this Court expanded *Morgan*, holding that while the specific question approved in *Morgan* was phrased in terms of whether prospective jurors would *always* or *automatically* vote for the death penalty in every case of first-degree murder, "the tenor of the language and the rationale in *Morgan* suggest that the wording of the question should not necessarily be limited to this specific inquiry but that a broader question should be permitted to assure a fair and impartial, qualified jury." *Conner*, 335 N.C. at 644, 440 S.E.2d at 841.

Thus, this Court held that the following questions were permissible *Morgan* inquiries:

> Is your support for the death penalty such that you would find it difficult to consider voting for life imprisonment for a person convicted of first degree murder?

> Would your belief in the death penalty make it difficult for you to follow the law and consider life imprisonment for first degree murder?

*Conner*, 335 N.C. at 643, 440 S.E.2d at 840. This Court went on to hold that three questions previously found inappropriate in *Taylor* were now acceptable. *Id.* at 645, 440 S.E.2d at 841. These questions were:

> [I]f the State convinced you beyond a reasonable doubt that the defendant was guilty of premeditated murder and you had returned that verdict guilty, do you think then that you would feel that the death penalty was the only appropriate punishment?

> . . . [I]f you had sat on the jury and had returned a verdict of guilty of first degree murder, would you then presume that the penalty should be death?

> . . . At the first stage of the trial and because of that you voted guilty for first degree murder, then do you think that you could at that time consider a life sentence or would your feelings about the death penalty be so strong that you couldn't consider a life sentence?

*Taylor*, 304 N.C. at 265, 283 S.E.2d at 772.

Initially, with respect to the life-qualifying *Morgan* questions, defendant complains that the trial court abused its discretion by the manner in which it controlled the *voir dire* and by refusing defendant's request to give each of two panels of prospective jurors a general explanation of the capital sentencing procedure under North Carolina law. The trial court gave very few preselection instructions to the prospective jurors collectively but in accord with the defendant's request, allowed individual, sequestered *voir dire*. Throughout the *voir dire* of each juror, the trial court deferred to the attorneys to explain the sentencing process but frequently would intervene to explain or expand on the law or to probe a juror's understanding or response. Generally, the district attorney gave the prospective juror an overview of the sentencing process, including the finding and weighing of aggravating and mitigating circumstances. In most situa-

tions throughout the *voir dire*, the district attorney, after asking if the juror could consider death as an appropriate sentence for first-degree murder, would ensure that the juror could also consider life imprisonment as a possible sentence. The trial court, either prior to or during the defense *voir dire*, would ask the juror if he or she could consider both a verdict of life and a verdict of death after hearing the evidence and instructions of the trial court.

The district attorney also advised each potential juror that defendant had previously pled guilty to first-degree murder, robbery with a dangerous weapon, and conspiracy to commit murder; that the issue of defendant's guilt had been established; that the jury would decide what sentence should be imposed; that the only sentencing options were life imprisonment or the death penalty; and that the trial court was required to impose the sentence recommended by the jury. Additionally, at the outset, each juror was asked questions concerning his or her personal background, knowledge of a list of witnesses and familiarity with the case. Following these general background questions, the district attorney asked each juror to express his or her opinion about the death penalty.

During defense *voir dire* on this point, defendant's attorney attempted to ask each juror a series of questions as to whether he or she considered a life sentence an appropriate and sufficient penalty for a person who kills another intentionally and deliberately, or "intentionally and premeditated," or if the juror believed a sentence of death should be given in all cases of "premeditated murder." This line of questioning, with very few exceptions, did not use the term "first-degree murder," but rather was framed in terms of "cold-blooded, premeditated murder," "premeditated murder," or "intentionally and deliberately." The trial court sustained the State's objections to most, but not all, of these and similar questions, apparently relying on this Court's holding in *Taylor*.

Defendant contends the denial of this type of question was error under *Morgan* and *Conner*, notwithstanding the fact that the trial court did not have the benefit of *Conner* for this jury selection, and defendant further contends this error cannot be harmless beyond a reasonable doubt under N.C.G.S. § 15A-1443(b) since the trial court refused to preliminarily instruct the jurors as to the nature of a capital sentencing proceeding. Defendant reasons that without such an instruction, a juror's expressed "ability to return a life sentence verdict if [the juror] felt life was the appropriate sentence does not pre-

clude a predisposition that life is never the appropriate sentence for premeditated murder." However, in *State v. Maynard*, 311 N.C. 1, 316 S.E.2d 197, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984), this Court held that it was not necessary for a juror to understand the process of a capital sentencing proceeding before he or she could be successfully challenged for cause on the basis of answers during jury *voir dire. Accord State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988).

"The trial court has the duty to control and supervise the examination of prospective jurors." *State v. Green*, 336 N.C. 142, 164, 443 S.E.2d 14, 27, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994). Regulation of the extent and manner of inquiries during *voir dire* rests largely in the trial court's discretion. *Id.*; *Mu'Min v. Virginia*, 500 U.S. 415, 114 L. Ed. 2d 493, *reh'g denied*, 501 U.S. 1269, 115 L. Ed. 2d 1097 (1991). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *Green*, 336 N.C. at 164, 443 S.E.2d at 27.

This Court has held that *voir dire* serves the dual purpose of ascertaining whether grounds exist for challenge for cause and of enabling counsel for the State and for the defendant to exercise intelligently their peremptory challenges. *State v. Allen*, 322 N.C. 176, 367 S.E.2d 626 (1988). However, we have held that the parties should not be able to elicit in advance what the jurors' decision will be under a certain set of facts. This type of "staking out" is improper. *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995); *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993). In order for a question on *voir dire* to be constitutionally required to be allowed, the inability to ask the question must render the defendant's trial fundamentally unfair. *Mu'Min*, 500 U.S. at 425-26, 114 L. Ed. 2d at 506.

Throughout the *voir dire* in the instant case, the questions and responses of counsel and the rulings by the trial court were generally consistent. The examination of Paul Stokes, the first juror seated, is typical with one exception. After the preliminaries, the district attorney explained the sentencing process, including the finding and weighing of aggravating and mitigating circumstances, and determined that Mr. Stokes could consider both the death penalty and life imprisonment in a first-degree murder case. When passed to the defendant, Mr. Stokes again had the process explained to him, includ-

**STATE v. SIMPSON**

[341 N.C. 316 (1995)]

ing the balancing of aggravating and mitigating circumstances, and he was asked whether he believed that every person who had committed "premeditated murder" should receive the death penalty. The State did not object to the question, and he responded, "Not necessarily." The trial court sustained objections to the following questions: (1) "Do you think that a sentence to life imprisonment is a sufficiently harsh punishment for someone who has committed cold-blooded, premeditated murder?" and (2) "Do you think that before you would be willing to consider a death sentence for someone who has committed cold-blooded, premeditated murder, that they would have to show you something that justified that sentence?" The objections to these questions were properly sustained because of their form. *See State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995).

In contending he was not allowed to ask the jurors life-qualifying *Morgan* questions, defendant points specifically to the *voir dire* of six prospective jurors: jurors Houchins, Ware, Atkins, Moore, Blackwell and Lawrence. Juror Houchins' *voir dire* by the State proceeded, in part, as follows:

Q. In this matter the defendant in a previous session of court entered pleas of guilty to murder in the first degree and robbery with a dangerous weapon and conspiracy to commit murder. Is there anything about the nature of any one or more of these offense[s] that so offends or otherwise effects [sic] you that you could not sit on a jury in this case?

A. No.

Q. Do you understand, Ma'am, because of previous findings of guilt there is no longer any question of his guilt or innocence. He is guilty of both [sic] offenses. Do you understand that?

A. Yes, I understand that.

Q. Does that bother you or upset you in any way?

A. No.

Q. Do you understand that the only question before this jury then will be what sentence is appropriate in this case?

A. Yes, sir.

Q. Do you understand, Ma'am, that the only sentences that the jury can consider are life imprisonment and death?

A. Yes, sir.

Q. Knowing that those are the only sentences available to the jury does that bother you or effect [sic] you in any way?

A. No.

. . . .

Q. Then do you believe also . . . that in some cases of murder in the first degree life imprisonment is the appropriate sentence?

A. In some cases.

Q. Do you believe as a juror you can fairly consider both sentences after you have heard all of the evidence and after you have been instructed by the Court?

A. Yes.

During the course of juror Houchins' *voir dire*, the trial court asked her: "If based upon the evidence that is presented and the law which the Court will give to you, if you felt that life imprisonment was an appropriate sentence in this case would you be able to come back into court and render a decision of life imprisonment?" Juror Houchins answered, "Yes." She was accepted by both sides and was the third juror seated.

The *voir dire* of the other five prospective jurors followed much the same pattern and format, with minor variations.

Juror Ware was the fourth juror seated and, like the jurors before her, was asked by the trial court, "Could you sit as a juror and hear all of the evidence, the law which I will give you about the case and if you thought it was appropriate could you render a verdict of life imprisonment?" She answered, "Yes, I could." Juror Ware also volunteered that she "would go by the Court's ruling and before I would judge a case I would have to see it, you know." The defendant also questioned her as to whether she had an open mind as to penalty, to which she replied, "Yes, I do have an open mind."

The sixth juror accepted by both sides and seated was juror Atkins. The State questioned, "Are you saying, sir, that you believe there are certain cases where the death penalty is not appropriate?" He answered, "Yes, I do." Further, juror Atkins responded affirmatively to the question, "What you are saying then is the factors surrounding the crime are matters that you think should be taken into

consideration?" The trial court, just as it had done with the preceding jurors, asked if juror Atkins could return a recommendation of life imprisonment if he felt it appropriate, and juror Atkins responded he could.

The eighth juror seated, juror Moore, was asked by the trial court if she too could consider life imprisonment, and she responded she could. She was also questioned, "Could you withhold making a decision until all [the evidence] is in and you are in the jury room?" Her response was, "Yes, sir."

Juror Blackwell, the ninth juror seated, replied as follows to defendant's question concerning what his feelings were on the penalty for first-degree murder: "I would have to hear the evidence on the first-degree murder. I can't say until I have heard the evidence." The trial court stated, "[I]f I understand you correctly, is that [sic] before you would ever make up your mind in this case, about which is the appropriate sentence that you are to hear everything that comes from the witness stand before you would ever decide the case?" Juror Blackwell responded, "That is right. Thank you."

The *voir dire* of juror Lawrence, the eleventh juror seated, was similar. The trial court inquired whether he could recommend life imprisonment if he felt life imprisonment was the appropriate punishment, based on the evidence and law, and after deliberating with his fellow jurors. He responded, "Yes, sir."

Upon a full review of the jury *voir dire*, it is apparent and we hold that each seated juror, through individual, sequestered examination, was made abundantly aware of the nature of the proceedings; that the issue of defendant's guilt had been established with his plea of guilty to first-degree murder; that the jury would decide the sentence to be imposed with the only options being life imprisonment or the death penalty; and further that each juror understood the sentencing process, including the finding and weighing of aggravating and mitigating circumstances. The majority of defendant's questions which were sustained were argumentative, were incomplete statements of the law, or were impermissible staking-out questions, and while the prospective jurors were not allowed to say how they would deal with "premeditated murder," they were required to state whether they could consider both a sentence of life imprisonment and a sentence of death with respect to first-degree murder. See *Skipper*, 337 N.C. at 19, 446 S.E.2d at 261. Each individual juror answered affirmatively and positively that he or she could consider a sentence of life impris-

onment in this first-degree murder case. While some of the questions which defendant attempted to ask were proper under *Morgan* and *Conner*, we conclude that any error in excluding them was rendered harmless through the examination by the trial court, the State and further examination by the defendant revealing that each "prospective juror was willing to consider a life sentence in the appropriate circumstances." *Conner*, 335 N.C. at 644-45, 440 S.E.2d at 841.

We find that the *voir dire* in the instant case was fully sufficient to serve its purpose of enabling counsel for the State and the defendant to determine whether grounds exist for challenge for cause and to exercise peremptory challenges intelligently. *Allen*, 322 N.C. at 190, 367 S.E.2d at 633. We conclude that the *voir dire* of each seated juror consisted of questions which reveal the essence of a *Morgan* inquiry, and that the State has shown any error to be harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988).

[2] Defendant next argues under this assignment of error that the trial court impermissibly imposed further limits upon him, in violation of the rationale of both *Morgan* and *Conner*, by sustaining objections to a variety of questions to potential jurors on *voir dire* relating to whether they could properly consider aggravating and mitigating circumstances. The defendant contends these rulings by the trial court violated his basic due process right to be tried by a fair and impartial jury.

Defendant sets forth twenty-five questions to which the trial court sustained the State's objections. It is defendant's sole contention that each of these twenty-five questions was improperly disallowed under *Morgan* and *Conner*. Several representative questions include:

Q.   Do you think that the punishment that should be imposed for anyone in a criminal case in general should be effected [sic] by their mental or emotional state at the time that the crime was committed?

Q.   . . . If you were instructed by the Court that certain things are mitigating, that is they are a basis for rendering or returning a verdict of life imprisonment as opposed to death and were those circumstances established you must give them some weight or consideration, could you do that?

Q.   Mr. Lawrence, in this case if there was evidence to support, evidence to show that the defendant was under the influence of a

mental or emotional disturbance at the time of the commission of the murder and if the Court instructed you that was a mitigating circumstance, if proven, that must be given some weight, could you follow that instruction?

Q. . . . If the Court advises you that by the preponderance of the evidence that if you are shown that the capability of the defendant to conform his conduct to the requirements of the law was impaired at the time of the murder, and the Court instructed you that was a circumstance to which you must give some consideration, could you follow that instruction?

Q. Do you believe that a psychologist or a psychiatrist can be successful in treating people with mental or emotional disturbance[s]?

Q. Do you personally believe, and I am talking about your personal beliefs, that if by the preponderance of evidence, that is evidence that is established, that a person who committed premeditated murder was under the influence of a mental or emotional disturbance at the time that the crime was committed, do you personally consider that as mitigating, that is as far as supporting a sentence of less than the death penalty?

Q. Now if instructed by the Court and if it is supported by the evidence, could you take into account the defendant's age at the time of the commission of the crime?

Q. Do you believe that you could fairly and impartially listen to the evidence and consider whether any mitigating circumstances the judge instructs you on are found in the jury consideration at the end of the case?

Upon review of each of these questions, we find that the majority were properly sustained as to form or as attempts to stake out or determine what kind of verdict a juror would render under certain named circumstances not yet in evidence. *See Skipper*, 337 N.C. at 23, 446 S.E.2d at 262; *State v. Yelverton*, 334 N.C. 532, 542, 434 S.E.2d 183, 188 (1993). However, assuming *arguendo*, that some of these questions should have been allowed under *Morgan*, any error in excluding them was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b). The trial court permitted questioning, for example, as to whether these jurors had any background or experience with mental problems in their families, or whether they had any bias against or problem with any mental health professionals, or whether they had

any experience with foster care. The trial court permitted adequate leeway in sufficient areas of questioning to enable the defendant to discern any prospective juror who harbored a latent bias against any type of evidence which defendant proposed to present in mitigation. The trial court, therefore, did not abuse its discretion in sustaining the objections to the questions specifically referenced. This assignment of error is overruled.

[3] In a related assignment of error, defendant contends that the trial court's excusal for cause of five potential jurors because of their opinions about the death penalty deprived defendant of his due process rights to a fair and impartial jury. Defendant contends these jurors were improperly excused in that their answers on *voir dire* showed they did not meet the standard for excusal under *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), and defendant again asserts these rulings by the trial court were exacerbated by its refusal to give prospective jurors general, preliminary instructions as to the nature of a capital sentencing proceeding.

A prospective juror may properly be excused for cause when his or her views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52; *accord Green*, 336 N.C. at 158, 443 S.E.2d at 24. We have not added the further requirement that a trial court explain the process of a capital sentencing proceeding to a prospective juror before an excusal for cause can be proper. As noted above, in *Maynard*, 311 N.C. 1, 316 S.E.2d 197, we held that "[a]n understanding of the *process* under which this ultimate conclusion is reached should not affect one's *beliefs* as to whether he or she can, under any circumstances, vote to impose the death penalty." *Id.* at 9, 316 S.E.2d at 202; *accord Wilson*, 322 N.C. at 128, 367 S.E.2d at 596.

We have held that "a prospective juror's bias may, in some instances, not be provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). Jury selection is within the sound discretion of the trial court. *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). We have further held that excusals for cause may properly include persons who equivocate or who state that although they

believe generally in the death penalty, they indicate that they personally would be unable or would find it difficult to vote for the death penalty. *See State v. Gibbs*, 335 N.C. 1, 436 S.E.2d 321 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 881 (1994).

Upon review of the *voir dire* of each of these five potential jurors in light of the above principles, it is clear that all were properly excused for cause. Juror Bowman acknowledged that she did not know how she felt about the death penalty, that she did not know whether she could return a death sentence, and she even stated that she felt it would be impossible to return such a sentence. She then stated that she was undecided about her feelings, that she did not wish to judge the defendant, and that because she was undecided about her feelings on the death penalty, she could not be fair to either the defendant or the State. It is clear from this examination that this juror could not have followed the law.

The next challenged excusal was that of juror Weston, who stated that while she felt the punishment should fit the crime, she believed her profession as a health-care provider would affect her judgment. She stated she did not believe she could return a sentence of death even if it was appropriate. She concluded that under no circumstances could she vote for the death penalty. It is abundantly clear from this *voir dire* that this juror would not be able to follow the law.

Juror Lee stated that while she believed in the death penalty, she did not believe she could vote for the imposition of the death penalty. She admitted she could not follow the law and could not personally vote to impose the death penalty.

Juror Hatcher stated that she had personal beliefs against the death penalty and thought she would automatically vote against the imposition of the death penalty. When questioned by the trial court, she stated unequivocally that she would not vote for the death penalty under any circumstances.

Finally, juror Wyatt stated that although she believed there were times when the death penalty could be needed, she did not want to be the one making that decision. She stated she would have a problem returning a death sentence even if she thought the evidence and the law supported such sentence. She equivocated as to whether she could return such a sentence, and after stating it would be hard for her to return a death sentence, she concluded she really felt she could not vote for the death penalty under any circumstances. Defense

counsel attempted to rehabilitate this juror, but she stated she would stand by what she had said to the judge, that she did not think she could give the death penalty.

It is abundantly clear from the responses of each of these jurors that their personal beliefs substantially impaired their ability to follow the law under the *Witt* standard, and the trial court correctly allowed the challenge as to each for cause. This assignment of error is overruled.

## SENTENCING ISSUES

In his next assignment of error, defendant argues that the trial court erred by not peremptorily instructing the jury on the statutory and nonstatutory mitigating circumstances which he contends were uncontroverted. Defendant submitted a general request for a peremptory instruction as to all mitigating circumstances. There was no separate request as to each. The mitigating circumstances submitted to the jury were composed of five statutory circumstances, sixteen nonstatutory circumstances, and the catchall circumstance.[1] The trial court gave a peremptory instruction only on the statutory mitigating circumstance that defendant "aided in the apprehension of another capital felon." N.C.G.S. § 15A-2000(f)(8) (Supp. 1994). We conclude that with respect to the other statutory mitigating circumstances submitted, it was not error for the trial court to refuse to peremptorily instruct, since the evidence relating to these circumstances was not uncontroverted. With respect to the nonstatutory mitigating circumstances, the proffered peremptory instruction called for an incorrect application of the law, and the trial court properly refused to give it.

The trial court is required to give a peremptory instruction, if the defendant so requests, when evidence showing that the mitigating circumstance exists is uncontroverted. *See State v. Johnson,* 298 N.C. 47, 257 S.E.2d 597 (1979). The five statutory mitigating circumstances submitted to the jury were whether: the defendant had no significant history of prior criminal conduct; the murder was committed while the defendant was under the influence of a mental or emotional disturbance; the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law

1. Of the five statutory mitigating circumstances, two were found to exist by one or more members of the jury. Of the sixteen nonstatutory mitigating circumstances, eleven were found to exist by one or more members of the jury. The catchall mitigating circumstance was not found to exist by any member of the jury.

was impaired; the age of defendant at the time of the murder was mitigating; and the defendant aided in the apprehension of another capital felon.

[4] Regarding the statutory mitigating circumstance that defendant had no significant history of prior criminal activity, the record of the case reveals that defendant's previous criminal convictions consisted of carrying a concealed weapon, contributing to the delinquency of a minor, and larceny. We have held "it is not merely the number of prior criminal activities, but the nature and age of such acts that the trial court considers in determining whether by such evidence a rational juror could conclude that this mitigating circumstance exists." *State v. Artis*, 325 N.C. 278, 314, 384 S.E.2d 470, 490 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). It is clear from this evidence of defendant's record that in considering the nature of the offenses and the age of the acts, the jury had ample basis to find that defendant's prior criminal activity was significant. It was, therefore, proper for the trial court to leave the determination of this statutory mitigating circumstance to the jury rather than to give a peremptory instruction.

[5] Regarding the circumstances of whether the murder was committed while the defendant was under the influence of a mental or emotional disturbance and whether defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, defendant maintains that the testimony of his psychological expert, Dr. Claudia Coleman, as well as his evaluation at Dorothea Dix Hospital, point, without contradiction, to the conclusion that these two mitigating circumstances exist. We are not so persuaded.

Defendant's detailed, written confession shows he was able to contemplate and plan the robbery and murder of Reverend Darter over a two-day period. After he had determined to kill Reverend Darter, he waited until dark to approach the house and once inside, instructed that the drapes be closed and that the telephone lines be cut. Defendant was able to select and choose his various murder weapons. Furthermore, Dr. Coleman, on cross-examination by the State, indicated that defendant's actions showed a plan, rather than impulse, to rob and kill Reverend Darter. Although Dr. Coleman diagnosed defendant as suffering from ADHD, this diagnosis was made several years after the murder, and cross-examination of this witness

revealed that at least three other mental health professionals who evaluated defendant did not share Dr. Coleman's opinion that defendant had ADHD. With respect to the N.C.G.S. § 15A-2000(f)(6) mitigator, defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, we note defendant concedes his evidence shows he did have capacity to understand the wrongfulness of his conduct and requested that only his capacity to conform his conduct be submitted to the jury. Thus, the record reflects the evidence overall is sufficient to put in controversy the existence of the mitigating circumstances that defendant suffered from a mental or emotional disturbance at the time of the murder, and that his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. The trial court correctly refused to give a peremptory instruction as to these mitigating circumstances.

[6] Regarding the age of defendant as a mitigating circumstance, the jury was instructed that while defendant was twenty-one at the time of the murder, the mitigating effect of his age must be evaluated in light of "all of the facts and circumstances which you find from the evidence." It is clear from this instruction that the jury was directed to consider and evaluate for mitigating effect defendant's chronological age in light of all the evidence of record, including that relevant to his age and maturity. The evidence here shows that at the time of the murder, defendant was soon to become a father, he had held several employment positions, he had a criminal background, and he was over the age of majority. From this background, if found from the evidence and evaluated in light of "all of the facts and circumstances," a reasonable juror could conclude that the defendant was immature, or that he was mature beyond his years. As this Court held in *State v. Turner*, 330 N.C. 249, 268-69, 410 S.E.2d 847, 858 (1991), the jury was not required to accept that defendant's age had mitigating value where the evidence showed defendant was twenty-two years old, had a bad childhood, had maintained employment, and had a previous criminal history.

Where defendant's age is requested as a mitigating circumstance and is submitted to the jury, it is the province of the jury, upon evaluation in light of all other facts and circumstances found from the evidence, to determine whether defendant's age should be "found" as a circumstance of mitigating value. *See State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577

(1991). Here the jury concluded it should not, and so did not, "find" this circumstance to exist. "Because the legislature has determined that the statutory circumstance has mitigating value, the effect of a peremptory instruction on a *statutory* mitigating circumstance is to remove the question of whether the circumstance has mitigating value." *Id.* at 60, 381 S.E.2d at 669. The requested peremptory instruction as to age was properly denied.

Therefore, as to four of the five statutory mitigating circumstances submitted, we hold that the trial court properly denied defendant's request for a peremptory instruction. The trial court gave a peremptory instruction on the fifth circumstance.

**[7]** We next consider whether it was error for the trial court to refuse to peremptorily instruct the jury upon the nonstatutory mitigating circumstances. At the charge conference, defendant proffered the following peremptory instruction: "([S]ince all of the evidence shows that) (read the mitigating circumstance) I hereby instruct you that you must (answer this mitigating factor 'yes' and—if peremptorily instructed) consider this factor in the defendant's favor in mitigation against the death penalty." We conclude that the proffered instruction was wholly inappropriate for nonstatutory mitigating circumstances. We have stated:

> [A]s to a proffered *nonstatutory* mitigating circumstance—unlike statutory ones—the jurors must first find whether the proffered circumstance exists factually. Jurors who find that a nonstatutory mitigating circumstance exists are then to consider whether it should be given any mitigating weight. Thus, a juror may find that a nonstatutory mitigating circumstance exists, but may give that circumstance no mitigating value.

*Green,* 336 N.C. at 173, 443 S.E.2d at 32 (citations omitted). Jurors must remain free to assign no mitigating value to a nonstatutory mitigating circumstance should they so choose, even if they find the circumstance exists in fact. In contrast, defendant's proposed instruction *required* jurors to assign some amount of mitigating value to the nonstatutory mitigating circumstances.

We conclude that defendant's proposed instruction called for an incorrect application of the law with respect to nonstatutory mitigating circumstances, and the trial court correctly refused to give it. This assignment of error is overruled.

[8]  In his next assignment of error, defendant argues that the trial court denied him due process of law by declining to instruct the jury, according to his proposed instruction, that statutory mitigating circumstances proven by a preponderance of the evidence must be given some mitigating weight. Defendant argues this failure could have resulted in a finding by a juror that a statutory mitigating circumstance did not have mitigating value, thus depriving him of due process of law and the right to be free from cruel and unusual punishment.

Defendant's proposed instruction reads in part, "I will inform you as to whether that mitigating factor is a statutory mitigating circumstance and by law must be considered in the defendant's favor in mitigation of punishment if found to be proven . . . ." Assuming *arguendo*, that this proffered instruction is a correct statement of law, there is no error in the trial court's refusal to give defendant's exact instruction, since the trial court gave the proposed instruction in substance. *See Hill*, 331 N.C. at 420, 417 S.E.2d at 782.

The record shows that the trial court described each statutory mitigating circumstance submitted and instructed the jurors that "[i]f one or more of you finds by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreman write, 'yes,' in the space provided after this mitigating circumstance on the 'Issues and Recommendation' form." The trial court defined a "mitigating circumstance" in part as one "which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders." Jurors were further instructed that they "must weigh [in Issue Three] the aggravating circumstances against the mitigating circumstances," and in the instructions on Issue Four, they were told, "you are not to consider the aggravating circumstances standing alone. You must consider them in connection with any mitigating circumstances found by one or more of you."

We find that the instructions given by the trial court imparted, in substance, the essence of defendant's proposed instruction. The instructions sufficiently informed the jurors that any statutory mitigating circumstance found to exist by one or more of them in Issue Two must be given weight in the determination of whether the aggravating circumstances outweigh the mitigating circumstances and whether the aggravating circumstances, so weighed against the mitigating circumstances, are sufficiently substantial to warrant the

imposition of the death penalty. Moreover, the instructions given are identical to the instructions we found to be free from error in *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). As we noted in *Daniels*, "[t]hese instructions are in accord with the pattern jury instructions. We conclude that the instructions here were given in accordance with the law and that the jury was able to follow the instructions as they were given." *Id.* at 275, 446 S.E.2d at 318. So, too, do we conclude in the present case. This assignment of error is overruled.

[9] In defendant's next assignment of error, again relating to his age, defendant contends the trial court erred by refusing to give an instruction proffered by him on the statutory mitigating circumstance of age. N.C.G.S. § 15A-2000(f)(7).

The defendant requested the following instruction be given to the jury:

> The statutory mitigating circumstance relating to the age of the defendant is not limited to the defendant's chronological age at the time of the murder. You must also consider the defendant's mental or emotional age at the time of the offense.

We find that this requested instruction is an incorrect statement of the law, and therefore, it was not error for the trial court to refuse to give it. We have held that " '[a]ny hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances.' " *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 333 (1983) (quoting *Giles v. State*, 261 Ark. 413, 421, 549 S.W.2d 479, 483, *cert. denied*, 434 U.S. 894, 54 L. Ed. 2d 180 (1977)). Rather than encouraging the jury to look at varying conditions and circumstances in its consideration of whether the defendant's age is mitigating, defendant's proposed instruction more narrowly defined age by confining consideration to only mental and emotional age along with chronological age. Inasmuch as the proffered instruction dictated a set formula for determining whether the defendant's age had mitigating value, the trial court correctly declined to give this instruction and opted instead to instruct from the pattern jury charge permitting a broader consideration.

The trial court's charge on age was as follows:

> The fourth possible mitigating circumstance is consider whether the age of the defendant at the time of this murder is a

mitigating factor. All of the evidence shows that the defendant's age was twenty-one at the time of the murder. The mitigating effect of the age of the defendant is for you to determine from all of the facts and circumstances which you find from the evidence.

This instruction does not limit the mitigating circumstance solely to chronological age. Rather, this instruction informs the jury that the mitigating effect of age is to be considered in light of "all of the facts and circumstances you find from the evidence." It permits the jury to consider such factors as the defendant's mental and physical maturity, experience, and prior criminal history as well as his chronological age in determining whether age is mitigating. *See Oliver,* 309 N.C. at 370, 307 S.E.2d at 333. We conclude the charge given did not limit inappropriately the mitigating concept of age as did defendant's proffered instruction. This assignment of error is overruled.

[10] Defendant next argues the trial court erred by several exclusions of allegedly relevant mitigating evidence, thus depriving him of his due process right to be free from cruel and unusual punishment.

Our capital punishment statute allows for evidence to be admitted at the separate sentencing proceeding which the trial court deems "relevant to sentence" or "to have probative value," including matters related to aggravating or mitigating circumstances. N.C.G.S. § 15A-2000(a)(3).

> The circumstances of the offense and the defendant's age, character, education, environment, habits, mentality, propensities and criminal record are generally relevant to mitigation; however, the ultimate issue concerning the admissibility of such evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation.

*State v. Pinch,* 306 N.C. 1, 19, 292 S.E.2d 203, 219, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Robinson,* 336 N.C. 78, 443 S.E.2d 306, *and by State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988).

Under this assignment of error, defendant first contends that the exclusion of testimony concerning the events necessitating defendant's placement in the foster-care system and his biological parents' refusal to allow his adoption into a permanent and stable family was error.

Social worker Joan Landreth testified for defendant that according to DSS records, defendant was placed in foster care when he was ten days old. The trial court, however, would not permit Landreth to testify that the reason precipitating defendant's placement in foster care was his mother's physical abuse of defendant's older brother.

We find that while certainly tragic, any abuse defendant's brother received at the hands of their mother has no relevance to the mitigation of defendant's crime. *See Robinson*, 336 N.C. at 115, 443 S.E.2d at 324 (father's treatment of defendant's sisters is not relevant to mitigation of defendant's crime). Thus, the trial court correctly excluded the evidence, as it was not relevant to sentencing. N.C.G.S. § 15A-2000(a)(3).

Landreth also was not permitted to testify that defendant's biological parents refused to allow him to be adopted. She was not allowed to testify about the conversations she had with defendant concerning adoption. Here again, the reasoning behind defendant's continued placement in the foster-care system, that his parents refused to allow his adoption, is irrelevant to defendant's sentencing proceeding. What is of import, however, is the *effect* this continued placement had upon defendant's life. We note that one or more jurors found as a nonstatutory mitigating circumstance that "the defendant's development was adversely affected by the lack of permanence in his life that was the result of frequent changes of placement in different foster homes and frequent changes in schools." This circumstance was not found in a vacuum, but rather from evidence before the jury, and it reflects the relevant fact of how the lack of permanence in defendant's life negatively affected him. We find no error in the exclusion of the proffered evidence.

[11] Second, defendant argues Landreth was improperly kept from rendering an expert opinion on defendant's emotional or mental disturbance. He also contends pertinent rebuttal evidence was improperly disallowed.

Landreth earned a bachelor's degree in education and had taken a few courses in psychology. At the sentencing proceeding, the trial court accepted her as an expert in matters of child placement and permanency planning. Landreth was not allowed to testify that defendant had suffered from an emotional or mental disturbance since childhood, that he was so afflicted at the time of the murder, and that his disorders stemmed, in part, from his untreated hyperactivity and his frequent movement between foster families.

Assuming, without deciding, that it was error for the trial court to exclude this testimony, we conclude that the excluded testimony would have been merely cumulative. The record of the case reveals that defendant was allowed to present the same evidence through Dr. Coleman, defendant's expert witness, who was accepted by the trial court as an expert in clinical, forensic and neuropsychology. Dr. Coleman testified that, in her expert opinion, defendant began suffering from ADHD at the age of five, and that his ADHD was severe at the time of the murder. She further related to the jury that defendant's situation in foster care had a negative impact on his ADHD. Therefore, since defendant successfully elicited the same testimony through another witness clearly qualified in the field, we conclude that any error in excluding Landreth's testimony was harmless beyond a reasonable doubt.

[12] Defendant further contends he was not allowed to present evidence in rebuttal to the State's contentions that defendant was an aggressive and dangerous person. During the course of Landreth's testimony, defendant sought to ask if she was "at any time afraid or fearful of being harmed by Perry [sic] Simpson when alone with him." Landreth was able to answer that she was not, but the trial court sustained the State's objection and instructed the jury not to consider the answer. The jury is assumed to have followed this instruction. However, our further review of the record reflects that the information would have been cumulative. Landreth was then allowed to testify that she would drive defendant back and forth to summer school, that "Perry [sic] was a very enjoyable child to be with," and that he "had a terrific sense of humor for a young person." From this evidence, it is quite clear that Landreth was not only unafraid of defendant, but rather enjoyed his company when they were together. Since defendant received the benefit of at least the equivalent of the excluded testimony, we conclude any error was harmless beyond a reasonable doubt.

[13] Third, defendant argues that several portions of Dr. Coleman's testimony were improperly excluded. Although accepted as an expert in clinical, forensic and neuropsychology, the trial court refused to allow Coleman to testify concerning her opinion as to whether most people who commit violent crimes suffer from mental or emotional disorders. We conclude that whether or not other defendants, or criminals in general, suffer from mental or emotional disorders has no relevance to the jury's determination of this particular defendant's sentence. N.C.G.S. § 15A-2000(a)(3).

**[14]** Likewise, the trial court refused to allow Dr. Coleman to testify as to what the proper treatment for defendant's ADHD would be. Defendant's offer of proof reveals that Dr. Coleman was of the opinion that defendant required a highly structured environment, along with medication, to alleviate his ADHD. Here again, any error was harmless beyond a reasonable doubt, since the excluded evidence would have been cumulative. The jury heard evidence through Dr. Coleman that people with ADHD need structure and consistency, and that medication was often necessary in severe cases. She classified defendant as having severe ADHD. Thus, defendant did receive the benefit of the excluded testimony.

Dr. Coleman was further prevented from testifying as to whether defendant's condition would improve if he was to continue living in prison. Even assuming the trial court erred in refusing this testimony, the error was harmless beyond a reasonable doubt, as there was testimony before the jury showing that defendant's behavior improved when he was in a structured environment. Indeed, one or more jurors found the nonstatutory mitigating circumstance that "defendant's behavior has improved during times when he was in a structured environment." The excluded testimony would have been cumulative.

**[15]** Fourth, defendant argues it was error for the trial court to disallow evidence that his accomplice, Stephanie Eury, received a life sentence. We have held that a jury is not entitled to consider, as mitigating, a codefendant's sentence for the same offense. *State v. Ward*, 338 N.C. 64, 449 S.E.2d 709 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 1013 (1995). We decline to depart from this precedent and reiterate that such information deals with matters unique to another person and does not in any way reflect upon defendant's character, record, or background. It is, accordingly, irrelevant as to sentencing. *Lockett v. Ohio*, 438 U.S. 586, 604 n.12, 57 L. Ed. 2d 973, 990 n.12 (1978).

**[16]** Fifth, defendant asserts that because the State was allowed to argue that the jury should weigh his conviction of robbery with a dangerous weapon as an aggravating circumstance in favor of the death penalty, he should have been allowed to show in rebuttal that he received a forty-year sentence as punishment for his robbery conviction. Defendant acknowledges he is aware of our holding in *State v. Robinson*, 336 N.C. at 106, 443 S.E.2d at 319, that a defendant may not introduce evidence of sentences imposed for offenses arising out of the same transaction as the murder, as such evidence puts before the

jury the irrelevant issue of parole. We were not persuaded in *Robinson* that same-transaction sentencing evidence was available to a defendant in order to rebut the State's use of the attendant crimes as evidence of aggravating circumstances. *Id.* However, defendant urges that *Simmons v. South Carolina,* 512 U.S. ——, 129 L. Ed. 2d 133 (1994), requires us now to reverse our holding in *Robinson.* We do not find that *Simmons* dictates such a result, since under the facts of that case, the defendant was clearly not eligible for parole. *Simmons* is, therefore, inapplicable to the facts here. We conclude that *Robinson* remains determinative of this issue.

After careful consideration, we find each of defendant's arguments under this assignment of error to be without merit.

**[17]** In his next assignment of error, defendant contends the trial court erred by permitting the State to improperly cross-examine Dr. Coleman concerning the diagnoses of other mental health professionals. These diagnoses were contained within reports upon which Dr. Coleman relied. This cross-examination, defendant argues, resulted in a violation of his constitutional right to confrontation.

At this third capital sentencing proceeding, Dr. Coleman testified she was contacted concerning an evaluation of defendant in 1989, some five years after the murder. It was Dr. Coleman's opinion that defendant suffered from ADHD at the time of the murder, and that he had in fact been so afflicted since childhood. On cross-examination, Dr. Coleman was asked if she reviewed defendant's prior medical and psychiatric evaluations. She replied that she had, and she also indicated that she had relied on the information contained within these evaluations in formulating her own diagnosis. The State proceeded to question Dr. Coleman concerning the fact that while she had diagnosed defendant as having ADHD, no other psychiatrist who previously evaluated defendant had reached the same determination. Defendant claims this is an impermissible attempt to put before the jury substantive evidence without allowing the defendant the chance to challenge the adverse information.

Rule 705 of the Rules of Evidence provides in part:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating

the opinion. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

N.C.G.S. § 8C-1, Rule 705 (1992). In *Allen,* 322 N.C. 176, 367 S.E.2d 626, we considered the application of Rule 705 to a situation analogous to the one presently before us. In *Allen,* the defense's expert witness relied upon material in a prior psychiatric report, yet the expert witness disagreed with the ultimate diagnosis in this report and formed his own. We reasoned that cross-examination by the State concerning the previous, differing diagnosis was proper, as Rule 705 provides for cross-examination on the underlying facts and data used by an expert in reaching his expert opinion. As the record disclosed, the expert did indeed rely upon the prior report though he rejected the diagnosis, and cross-examination as to the different diagnosis was proper. *Id.* at 183, 367 S.E.2d at 629-30.

Turning to the instant case, we find *Allen* dispositive of this issue. It was not necessary, as defendant argues, for Dr. Coleman to rely on the actual, differing diagnosis. Pursuant to Rule 705, Dr. Coleman was properly cross-examined about other diagnoses contained within psychiatric reports upon which she relied, although she ultimately formed a differing diagnosis. This assignment of error is overruled.

**[18]** In defendant's next assignment of error, he contends the trial court erred by instructing the jury in accord with the pattern jury instructions on reasonable doubt, with respect to aggravating circumstances and the statutory questions required for a death sentence, and on preponderance of the evidence, with respect to mitigating circumstances.

The trial court instructed the jury on reasonable doubt as follows:

A reasonable doubt members of the jury is a doubt based upon reason and common sense arising out of some or all of the evidence that has been presented or the lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you . . . .

Defendant contends that the last sentence of the charge on reasonable doubt diminishes the State's burden of proof and enables jurors to find aggravating circumstances and issues required for a death sentence by evidence less than that required by the "beyond a reasonable doubt" standard. It is the words "fully satisfies" that defendant finds particularly offensive, and he contends their presence renders the

entire charge vague and subjective such that it violates the North Carolina and United States Constitutions.

This particular instruction, including the last sentence, has been found to pass constitutional muster many times by this Court. *State v. Jones,* 336 N.C. 490, 445 S.E.2d 23 (1994); *State v. Hudson,* 331 N.C. 122, 415 S.E.2d 732 (1992), *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 136, *reh'g denied,* —— U.S. ——, 122 L. Ed. 2d 776 (1993). We perceive no way in which the jury could have reasonably viewed or construed the words "fully satisfies" within this instruction in such a manner as to lessen the State's burden or leave "the matter entirely to the subjective judgment of each juror." Defendant's argument does not persuade us to change our previous holdings.

With respect to the charge on preponderance of the evidence, defendant complains the trial court erred in instructing the jury as follows:

> Now the defendant has the burden of persuading you that a given mitigating circumstance exists. The existence of any mitigating circumstance must be established by a preponderance of the evidence, that is, the evidence, taken as a whole must satisfy you—not beyond a reasonable doubt, but simply satisfy you— that any mitigating circumstance exists.

Defendant asserts this instruction is both subjective and vague. Defendant proposes instead that the jury should have been instructed, in accord with the pattern instruction for civil cases, that defendant bore his burden by the "greater weight of the evidence" and by evidence that makes a fact "more likely than not to exist."

We have previously held that "by the preponderance of the evidence" is the correct burden of proof for establishing the existence of mitigating circumstances. *State v. Payne,* 337 N.C. 505, 448 S.E.2d 93 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 292 (1995). We have also previously determined that a trial court's use of the word "satisfy" "denotes a burden of proof consistent with a preponderance of the evidence." *Payne,* 337 N.C. at 533, 448 S.E.2d at 109. This argument does not offend the Due Process Clause, is without merit, and is overruled.

PRESERVATION ISSUES

[19] Defendant brings forward four issues for preservation purposes. First, defendant argues that the definition of the aggravating circum-

STATE v. SIMPSON

[341 N.C. 316 (1995)]

stance that the murder was "especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9), is vague and overbroad, both on its face and as applied. We have consistently rejected this argument. *State v. Ingle*, 336 N.C. 617, 445 S.E.2d 880 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 222 (1995).

[20] Second, defendant contends the trial court erred by using the pattern jury instruction defining mitigating circumstances in that the pattern instruction improperly focused on matters which would reduce the culpability of the killing, instead of focusing on both the killing and defendant himself. We have previously rejected this claim. *Robinson*, 336 N.C. at 121, 443 S.E.2d at 327.

[21] Third, defendant asserts that the trial court erred by refusing to instruct the jury that, pursuant to N.C.G.S. § 15A-2000(b), if it failed to agree on a sentencing recommendation within a reasonable amount of time, the trial court would impose a life sentence. We have consistently held that such an instruction is improper, as it tends to encourage jurors to avoid their responsibility to try to reach a unanimous recommendation, if that can be done without injury to the conscience. *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991); *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986); *State v. Boyd*, 311 N.C. 408, 319 S.E.2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985).

[22] Fourth, defendant contends that the trial court's instructions on the nonstatutory mitigating circumstances were violative of the North Carolina and United States Constitutions as they limited the jury's consideration of mitigation. We have rejected this argument before, as the Constitutions do not require that jurors accept whatever a defendant chooses to proffer as being, in fact, mitigating. *Robinson*, 336 N.C. at 117, 443 S.E.2d at 325.

[23] Defendant also presents another issue which he should have treated as a preservation issue. Defendant contends the trial court improperly refused to allow him to question potential jurors on *voir dire* concerning their attitudes or understanding regarding parole eligibility and to inform the potential jurors that defendant would be ineligible for parole for twenty-seven years. "[E]vidence about parole eligibility is not relevant in a capital sentencing proceeding because it does not reveal anything about defendant's character or record or about any circumstances of the offense." *Payne*, 337 N.C. at 516, 448 S.E.2d at 99; *accord State v. Miller*, 339 N.C. 663, 455 S.E.2d 137, *reh'g*

*denied,* 340 N.C. 118, 458 S.E.2d 183, *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3247 (1995). Despite defendant's argument to the contrary, *Simmons v. South Carolina* "does not affect our position on this issue when, as here, the defendant remains eligible for parole if given a life sentence." *Miller,* 339 N.C. at 676, 455 S.E.2d at 144.

Upon careful review of these preservation issues, we find no reason to alter or reverse our previous holdings and conclude that each issue is altogether without merit.

[24] Finally, defendant asserts that the standards set by this Court for proportionality review, mandated by N.C.G.S. § 15A-2000(d)(2), are vague and arbitrary to the extent they deprive defendant of his constitutional rights "to notice, effective assistance of counsel, due process of law and to be free from cruel and unusual punishment." This broad assertion is basically encompassed in the argument that, while not constitutionally mandated, our statutorily required review creates "a liberty interest" which is entitled to procedural due process against arbitrary application. *Board of Pardons v. Allen,* 482 U.S. 369, 96 L. Ed. 2d 303 (1987). Defendant argues that, in several respects, the manner in which this Court conducts proportionality review is arbitrary "or undefined" in that it allows for the application of different standards to each case. Defendant requests that we delay proportionality review in this case until after we schedule and conduct a hearing on proposals for this Court's "creation of guidelines for its proportionality review of death cases."

Defendant suggests several deficiencies, including assertions that cases remanded for new sentencing in which life sentences were then returned are not included in the pool of cases; that it is unclear whether the Court is making factual findings or relying on findings made by the jury; that cases involving premeditated murders are treated in some instances as more serious than felony murders; that the Court looks only at aggravating and not mitigating circumstances; and that, hypothetically, if the Court makes certain assumptions when considering a case in the pool, then that arbitrarily skews the balance against defendant. Upon consideration, we find all of the deficiencies defendant argues apply to be without merit.

This Court first explained the makeup of the pool of cases used for review in *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), and we there clarified the purpose, methodology

and focus of the review, i.e., the equivalency of sentences in roughly "similar cases," considering both the crime and the defendant. It has long been clear that this Court does more than merely reweigh the aggravating and mitigating circumstances found by the jury, but searches the record for the nuances of each particular case. *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). We recently clarified the pool at length in *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), where we determined that cases in which the sentence of death was affirmed by this Court on direct appeal, in which a post-conviction proceeding resulted in a ruling that the State could not prosecute the defendant for first-degree murder or in a retrial at which the defendant is acquitted or found guilty of a lesser-included offense, would no longer be in the pool. We have further determined that cases in which a life sentence is given on resentencing will be included in the pool for review. *Id.* Therefore, the pool is not arbitrarily skewed in favor of death-affirmed cases.

It would appear defendant seeks to change our established and well-defined procedure for review into a precise set of "guidelines" for statistical review, the very process which we expressly declined to follow in *Williams*, wherein we said:

> We do not propose to attempt to employ mathematical or statistical models involving multiple regression analysis or other scientific techniques, currently in vogue among social scientists, which have been described as having "the seductive appeal of science and mathematics." The factors to be considered and their relevancy during proportionality review in a given capital case are not readily subject to complete enumeration and definition. Those factors will be as numerous and as varied as the cases coming before us on appeal.

*Williams*, 308 N.C. at 80, 301 S.E.2d at 355 (citation omitted). Counsel for any capitally tried defendant should well know from our case law the manner in which we undertake proportionality review.

Defendant presents no basis to find this Court's standards or procedures for proportionality review deficient in any respect. We conclude there is substantially less basis for any such assertions now than when they were first raised and rejected by this Court in *Pinch*, 306 N.C. 1, 292 S.E.2d 203.

This assignment of error is overruled.

PROPORTIONALITY REVIEW

[25]   Having found no error in the sentencing phase, it is now our duty to consider whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The trial court submitted two aggravating circumstances to the jury: that the murder was committed while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury found both aggravating circumstances to exist. We conclude that the jury's finding of each of the aggravating circumstances was supported by the evidence. We further conclude that the jury did not sentence defendant to death while under the influence of passion, prejudice, or any other arbitrary factor.

We now turn to our final statutory duty and determine whether the sentence of death in this case is excessive or disproportionate. One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). We compare this case to similar cases in the pool, defined in *State v. Williams,* 308 N.C. at 79-80, 301 S.E.2d at 355 and *State v. Bacon,* 337 N.C. at 106-07, 446 S.E.2d at 563-64, as those that "are roughly similar with regard to the crime and the defendant." *Lawson,* 310 N.C. at 648, 314 S.E.2d at 503. Ultimately, whether the death penalty is determined to be disproportionate "rest[s] upon the 'experienced judgments' of the members of this Court." *Green,* 336 N.C. at 198, 443 S.E.2d at 47.

This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v.*

*Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). The present case is, however, distinguishable from each.

In *State v. Benson*, the defendant robbed the victim and shot him in the legs. The victim died of cardiac arrest, and defendant was convicted of first-degree murder based solely upon the theory of felony murder. The only aggravating circumstance found by the jury was that the crime was committed for pecuniary gain. In determining the sentence to be disproportionate, this Court noted that it appeared defendant was simply attempting to rob the victim because he only fired at the victim's legs. 323 N.C. at 329, 372 S.E.2d at 523. By contrast, in the present case, defendant decided before he ever entered the house he would kill Reverend Darter and went about his purpose with the aid of belts, a bottle and a double-edged razor blade. Indeed, so gruesome was this murder that the jury found it was "especially heinous, atrocious, or cruel."

In *State v. Stokes*, the defendant, who was but seventeen, along with four other individuals robbed and beat the victim to death. Defendant was found guilty of first-degree murder under the theory of felony murder, and only one aggravating circumstance, that the crime was especially heinous, atrocious, or cruel, was found. This Court found the sentence of death disproportionate, in part, because only the defendant had received the death penalty. One of defendant's accomplices received a life sentence even though he "committed the same crime in the same manner." 319 N.C. at 27, 352 S.E.2d at 667. By contrast, in the present case, defendant's culpability was greater than that of his accomplice. It was defendant who wrapped two belts around Reverend Darter's neck; who beat the Reverend in the face with a glass bottle; and who, with a double-edged razor blade, sliced the Reverend's arms, seventeen inches on one arm and fourteen inches on the other. Although defendant's accomplice, Stephanie Eury, received a life sentence, she and defendant did not commit "the same crime in the same manner."

In *State v. Rogers*, the defendant was convicted of first-degree murder for mistakenly shooting the victim. Defendant had intended to shoot the victim's friend, with whom he was arguing. Only one aggravating circumstance was found, that "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or per-

sons." 316 N.C. at 234, 341 S.E.2d at 731. By contrast, in the present case, this killing was not a mistake, nor was it committed during an argument. Defendant took great care to wait until it was dark outside before he and his accomplice approached the victim's house. Defendant even took the precaution of ordering his accomplice to cut the telephone lines so that Reverend Darter could not call for help.

In *State v. Young*, the defendant, after drinking heavily all day, stabbed and robbed a man in order to buy more liquor. Defendant had two accomplices with him. The Court noted that in armed robbery cases where death is imposed, the jury has found the aggravating circumstance that the defendant was engaged in a course of conduct that included the commission of violence against another person and/or that the crime was especially heinous, atrocious, or cruel. 312 N.C. at 691, 325 S.E.2d at 194. Neither of these circumstances was found by the jury in *Young*. By contrast, in the present case, the jury found that Reverend Darter's murder was especially heinous, atrocious, or cruel.

In *State v. Hill*, the defendant shot a police officer while engaged in a struggle near defendant's automobile. This Court found the death sentence disproportionate based, in part, on the speculative nature of the evidence surrounding the murder and the apparent lack of motive. 311 N.C. at 479, 319 S.E.2d at 172. By contrast, in the present case, the evidence shows it was indeed the defendant who viciously murdered a ninety-two-year-old man for a lamp, a radio, a bag of food, boxes of Kleenex, and a plastic laundry basket.

In *State v. Bondurant*, the defendant pointed a gun at the victim and taunted him for some two to three minutes before finally shooting him. Of importance to the Court in finding the death sentence disproportionate was that defendant immediately secured medical attention for the victim, directing the driver of the car to the hospital. 309 N.C. at 694, 309 S.E.2d at 182-83. By contrast, in the present case, defendant did not seek medical attention for the retired preacher. Instead, defendant left Reverend Darter to die in his blood, tied to his bed.

In *State v. Jackson*, the defendant flagged down the victim's car, telling his companions that he intended to rob the victim. The victim was later found dead with two gunshot wounds to the head. This Court found the death sentence disproportionate because there was "no evidence of what occurred after defendant left with McAulay [the

victim]." 309 N.C. at 46, 305 S.E.2d at 717. By contrast, in the present case, the defendant confessed that, in fact, he killed Reverend Darter.

We are aware that juries have imposed life sentences in several robbery-murder cases. This fact nevertheless "does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. This Court too has long rejected a mechanical or empirical approach to comparing cases that are superficially similar. *Robinson*, 336 N.C. at 139, 443 S.E.2d at 337.

We find that this case is similar in many respects to one case in particular in which we have found the sentence of death proportionate—*State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542. In *Bacon*, defendant plotted with his lover, Bonnie Sue Clark, to kill her estranged husband so they could share a total of $130,000 in life insurance proceeds. The two lured the victim into a car, and as they drove down the street, defendant stabbed the victim sixteen times with a knife he had earlier placed on the floor. Clark, who was driving the car, pulled into a parking lot, and defendant hit her head against the car window and instructed her to say that she and her husband had been robbed. Defendant then went home, showered and had a drink. *Bacon*, 337 N.C. at 108, 446 S.E.2d at 565. At the capital sentencing proceeding, the jury found the one aggravating circumstance submitted—that the murder was committed for pecuniary gain. One or more members of the jury also found the existence of nine mitigating circumstances— that defendant had no significant history of prior criminal activity; acted under the domination of another person; had no history of violent behavior; had character, habits, mentality, propensities and activities indicating that he was unlikely to commit another violent crime; had committed the murder as a result of circumstances unlikely to recur; had established that his codefendant, Bonnie Sue Clark, had received a life sentence; had shown remorse since his arrest; and had a family who loved him, continued to visit him while he has been incarcerated, and would continue to do so. The jury refused to find, among others, that the murder was committed while defendant was under the influence of a mental or emotional disturbance; that his capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law was impaired; and that his age had mitigating value. *Id.* at 82-83, 446 S.E.2d at 549. The Court concluded that the sentence of death was not disproportionate in light of the calculated and brutal nature of the murder, "all for half of

the victim's rather meager insurance proceeds." *Id.* at 116, 446 S.E.2d at 570.

Likewise, in the present case, defendant schemed and plotted his attack upon an old and defenseless man who had welcomed defendant into his home and given him food and aid. Defendant lurked outside the house waiting for night to fall before he forced his way inside and mercilessly terrorized and tortured a man who only the day before had tried to help him. Just as the defendant in *Bacon*, this defendant's ability to appreciate the criminality of his conduct was not found to be impaired. In light of the fact that the victim befriended the defendant only the day before his murder, and the utterly brutal manner in which defendant murdered this elderly man, we find this murder to be even more callous than the murder in *Bacon*.

We conclude that defendant received a fair sentencing proceeding, free from prejudicial error. Further, after comparing this case to similar cases in which the death penalty was imposed and considering both the crime and the defendant, we cannot hold, as a matter of law, that the sentence of death was disproportionate or excessive.

NO ERROR.