**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-3

PERRIE DYON SIMPSON,

Petitioner - Appellant,

versus

MARVIN POLK, Warden, Central Prison, Raleigh,
North Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  William L. Osteen, District
Judge.  (CA-99-741-1)

Argued:  February 4, 2005          Decided:  April 21, 2005

Before MOTZ, TRAXLER, and GREGORY, Circuit Judges.

Affirmed by unpublished opinion.  Judge Traxler wrote the opinion,
in which Judge Motz and Judge Gregory joined.

**ARGUED:** Robert Mauldin Elliot, ELLIOTT, PLISHKO & MORGAN, P.A.,
Winston-Salem, North Carolina; Polly D. Sizemore, HILL, EVANS,
DUNCAN, JORDAN & DAVIS, P.L.L.C., Greensboro, North Carolina, for
Appellant. Barry Steven McNeill, Assistant Attorney General, NORTH
CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellee.  **ON BRIEF:** Joseph P. Gram, HILL, EVANS, DUNCAN, JORDAN &
DAVIS, P.L.L.C., Greensboro, North Carolina, for Appellant.  Roy
Cooper, Attorney General of North Carolina, Raleigh, North
Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

TRAXLER, Circuit Judge:

Perrie Dyon Simpson was convicted of capital murder and sentenced to death in a North Carolina state court. After unsuccessfully challenging his murder conviction in state court on direct review and in state habeas proceedings, Simpson filed a petition for writ of habeas corpus in federal district court. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 2004). The district court denied his application for relief, and declined to issue a certificate of appealability. We granted a certificate of appealability to review three claims. See 28 U.S.C.A. § 2253(c)(1) (West Supp. 2004). For the reasons set forth below, we affirm.

I.

On August 27, 1984, Simpson and his sixteen-year-old girlfriend, Stephanie Yvette Eury, forced their way into the home of Reverend Jean Ernest Darter, a 92-year-old retired minister, burglarized the home, and murdered Reverend Darter.

Doris Faircloth, the victim's daughter, became concerned when she could not reach her father by telephone, and she and her husband drove to the victim's home that evening. As they entered the home, they observed that all of the lights were off except for a bathroom light. Reverend Darter was found lying across his bed with a strap tying his neck to the bedpost. According to Ms. Faircloth, what she saw was "'so horrible that [she] seemed not to

3

be able to see it all collectively,'" but rather "'in bits and pieces.'" State v. Simpson, 462 S.E.2d 191, 197 (N.C. 1995).

Officers responding to the murder scene found no signs of forced entry. The telephone cords in the hall and bedroom had been cut. In one bedroom, the sheets and covers on the bed were wadded up, the dresser drawers had been pulled out, and the contents from the drawers had been dumped onto the floor. A number of knives were found lying in the kitchen sink and the freezer and refrigerator doors were cracked open. In a storage area adjacent to the kitchen, the officers found a carton of glass Tab bottles with one bottle missing. A pack of razor blades was in the bathroom sink. The officers also found a writing pad with the names "Lisa Marie Johnson" and "Curtis Anthony Parker" written on it. Reverend Darter was found lying on his bed, with his feet on the floor. The scene was further described by the North Carolina Supreme Court as follows:

> Two belts were wrapped around Reverend Darter's neck. The outer belt was the largest and thickest, and it was tied to the bedpost. The inner belt was broken. Reverend Darter's face was bloated and bloody. He had glass in his left eye, and a design composed of many small circles and dots was imprinted on the Reverend's left cheek. Both of the Reverend's arms were cut open from his elbows to his wrists. Blood was on the bed and had run down the side of the bed and formed a puddle on the floor; there was blood on the walls and window blinds. Also on the bed were the contents of two dresser drawers, shattered glass, the Reverend's broken glasses, his false teeth, a razor blade, and the neck of a glass Tab bottle.

Id.

4

Eight latent fingerprints and Reverend Darter's telephone bill led police investigators to Simpson. According to the telephone bill, a long-distance telephone call had been placed on the day before the murder from Reverend Darter's house to a telephone number belonging to a woman named Ruby Locklear in Greensboro, North Carolina. When questioned, Ms. Locklear told the officers that Simpson would occasionally call her from Reidsville when he wanted to reach his father. The fingerprints matched those of Simpson.

An autopsy performed by pathologist Michael James Shkrum revealed further details of the gruesome crime:

> [T]he Reverend sustained blunt-trauma injuries to his face causing swelling and bruising. The bone between the eye socket and the brain was fractured, the cheek and the jaw bone were broken, and the Reverend's tongue was torn. Strangulation bruises appeared on the neck. It was Dr. Shkrum's opinion that Reverend Darter died from ligature strangulation, and that it would have taken several minutes for his heart to stop beating. It was Dr. Shkrum's further opinion that Reverend Darter experienced pain. Dr. Shkrum also testified that because Reverend Darter sustained bruising around his face, his heart was still beating when those injuries were inflicted.

Id. at 199.

During the investigation, officers discovered that there was an outstanding warrant for Simpson in Greensboro for simple assault. Simpson was arrested on September 21, 1984, and advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). He initially claimed to know nothing about the murder, denied ever having met or seen Reverend Darter, and denied ever having been

5

inside Reverend Darter's home. After he was transported to Greensboro for a bond hearing on the simple assault charge, however, Simpson agreed to talk with the officers about the Darter murder and ultimately executed a sixteen-page, detailed written statement confessing to the crime. The North Carolina Supreme Court summarized the confession as follows:

> Defendant confessed that on 26 August 1984, he and his pregnant, sixteen-year-old girlfriend, Stephanie Eury, went for a walk to look for some money. Stephanie went to the front door of Reverend Darter's house and rang the doorbell. She told Reverend Darter she was hungry, so he brought her a diet soft drink and gave the defendant a glass of milk. Stephanie asked if they could come inside, so the three went into the front living room. Stephanie told the Reverend that she and defendant were traveling to Florida and had gotten stuck in Reidsville. The Reverend suggested they contact the Salvation Army or the police. Stephanie asked Darter if he could give them some money, and Reverend Darter gave her four dollars, explaining that was all the money he had in cash. Defendant told police that he and Stephanie "noticed the preacher had a nice home." After getting permission to use the telephone, defendant called Ruby Locklear in Greensboro to see if she had seen defendant's father. When defendant got off of the telephone, he heard Stephanie tell the Reverend her name was "Lisa" and defendant's name was "Curtis Anthony." Defendant watched the Reverend write these names down on a pad of paper. Defendant told the police that before he and Stephanie left the house, the Reverend gave them some sponge cake and peaches to take with them. Defendant admitted that "Reverend Darter was real friendly to us and was very helpful."

> The next day, 27 August 1984, defendant said that he and Stephanie "both talked about going back to preacher Darter's house to get some money. Stephanie and I decided we would go back to Darter's house and we would not come back empty-handed no matter what." Defendant told police that he and Stephanie walked around outside waiting for it to get dark. Once it was dark enough, the two walked to Reverend Darter's house, looking around to make sure

6

no one saw them.  They rang the doorbell, and when Reverend Darter answered the door, they forced their way inside.  Reverend Darter ran to the telephone, but defendant "pulled the preacher's hands off the telephone."  Defendant told Stephanie to cut the telephone cords, and in the meantime, he was "struggling with Preacher Darter holding onto the preacher's arms to control him and force him back in his bedroom so he would tell me where some money was."  Defendant held the Reverend down on the bed, with his hands around his neck, telling him he wanted money "or else," but the Reverend told defendant he did not have any money.

The Reverend told defendant that if he was killed, he knew he was going to heaven.  Defendant told the police, "this frustrated me and I grabbed him tighter around the throat."  Defendant reached across the bed and got a belt and "looped it around his neck and tightened the belt." While he held the belt tight, defendant rummaged through two dresser drawers Stephanie had dumped onto the bed. Not finding anything he wanted, defendant drew the "belt more tight around his neck and I told the preacher he had better tell us where some more money was but the preacher could not talk because he was choking."  When the first belt broke, defendant got another, thicker belt "and looped this leather belt around the preacher's neck and tightened up on this leather belt.  Then I called Stephanie to bring me something in the bedroom to kill this preacher with."

When defendant did not receive any weapon to his liking, he called for Stephanie to come and hold the belt while he "went in the kitchen and looked for some device to beat the old preacher and finish him off."  He picked up a full pop bottle and then decided to put it back and get an empty bottle.  He returned to the bedroom, pulled tight on the belt, and "hit the old preacher hard three times with this bottle and on the third blow the soft drink bottle broke."  Defendant then decided to tie the end of the belt to the bedpost, and he went into the bathroom and got a double-edged razor blade.  "I held this double-edged razor blade between my right index finger and right thumb and then I sliced the preacher's arms from the biceps all of the way down the under side of the forearms to the wrist.  I cut both of the preacher's arms." Stephanie gathered a bag of food, a porcelain lamp, a radio, and boxes of Kleenex and packed them in a plastic laundry basket.  "The last thing we did

7

> before leaving the preacher's house was to turn off all the lights except the bathroom light."

Simpson, 462 S.E.2d at 198-99. According to one officer, when Simpson read the statement out loud to check for mistakes he laughed when he came to a portion of the statement where he had used profanity.

On March 4, 1985, Simpson entered a plea of guilty to first-degree murder, conspiracy to commit murder, and armed robbery. Under a plea agreement, Simpson reserved his right to appeal from the state trial court's denial of his motion to suppress his confession and the state dismissed the charge of first-degree burglary. A sentencing hearing was held, at the conclusion of which the jury returned a verdict recommending a sentence of death.

On July 7, 1987, the Supreme Court of North Carolina rejected Simpson's appeal of the order refusing to suppress his confession and affirmed the convictions, but vacated the sentence of death and remanded for a new sentencing hearing due to an error that had occurred during closing argument. See State v. Simpson, 357 S.E.2d 332 (N.C. 1987), cert. denied, Simpson v. North Carolina, 485 U.S. 963 (1988). A second sentencing hearing was held in May 1989, and Simpson again received a sentence of death. This time, the Supreme Court of North Carolina vacated the sentence and remanded for a new sentencing hearing due to an error under McKoy v. North Carolina, 494 U.S. 433 (1990). See State v. Simpson, 415 S.E.2d 351, 353 (N.C. 1992).

8

In January 1993, Simpson's third sentencing proceeding took place. In mitigation, Simpson presented testimony of various persons who knew him during his childhood and his case manager at the prison where he had been incarcerated pending trial. The heart of the case in mitigation, however, centered on the testimony of Ms. Joan Landreth, a social worker, and Dr. Claudia Coleman, a clinical psychologist. In summary, Ms. Landreth related to the jury that Simpson had been removed from his mother at birth and placed into the North Carolina foster care system, where he languished for the rest of his childhood. Dr. Coleman opined that this background, along with a personality disorder, exacerbated Simpson's severe and untreated attention deficit hyperactivity disorder (ADHD) causing him to suffer from severe mental and emotional disturbances and an impaired ability to conform his conduct to the requirements of the law.

At the conclusion of the sentencing hearing, the jury found as aggravating factors that the murder of Reverend Darter was committed by Simpson while he was engaged in the commission of robbery and that the murder was especially heinous, atrocious, or cruel. The jury found thirteen mitigating circumstances: (1) that the murder was committed while the defendant was under the influence of mental or emotional disturbance; (2) that the defendant aided in the apprehension of another capital felon; (3) that the mental or emotional age of the defendant at the time of

9

the murder was a mitigating circumstance; (4) that the defendant's development was adversely affected by the lack of permanence in his life resulting from frequent changes in foster home and school placements; (5) that the defendant was taken into and removed from the home and care of his grandmother during which time his brother, Daryl, continued to remain in the home and care of his grandmother; (6) that the defendant experienced mental or emotional disturbance beginning at an early age; (7) that the defendant's mental or emotional disturbance adversely affected his ability to perform in school; (8) that the defendant's mental or emotional disturbance adversely affected his ability to sustain employment; (9) that the defendant's behavior has improved during times when he was in a structured environment; (10) that prior to his arrest for murder, the defendant freely and voluntarily confessed, both orally and in writing, to his involvement in the murder; (11) that the defendant did not minimize his personal culpability for the murder in the course of his confession; (12) that the defendant voluntarily consented to a search of his portion of the Eury residence for evidence of the robbery and murder; and (13) that the defendant voluntarily entered a plea of guilty to the offenses of murder, armed robbery, and conspiracy to commit murder. However, the jury unanimously decided that the aggravating circumstances outweighed these mitigating circumstances and recommended that Simpson be sentenced to death for the murder of Reverend Darter.

10

On direct appeal to the North Carolina Supreme Court, Simpson asserted, among other claims, that the trial court erred in allowing the prosecution to cross-examine Dr. Coleman about diagnoses and opinions of other physicians and psychologists which were contained within the reports she had reviewed and erred in refusing to allow Ms. Landreth to testify regarding several additional matters that he contends would have had mitigating value. The North Carolina Supreme Court affirmed Simpson's death sentence, see Simpson, 462 S.E.2d at 200, and the United States Supreme Court denied Simpson's petition for writ of certiorari, see Simpson v. North Carolina, 516 U.S. 1161 (1996).

In 1997, Simpson was appointed new legal counsel and initiated state post-conviction proceedings by filing a motion for appropriate relief ("MAR") in the North Carolina Superior Court. The motion alleged, among other things, that Simpson's plea of guilty entered in 1985 was not the result of a knowing and informed decision because he did not fully understand the consequences of pleading guilty. The state MAR court denied Simpson post-conviction relief and the North Carolina Supreme Court denied review. See State v. Simpson, 539 S.E.2d 648 (N.C. 1999).

Pursuant to 28 U.S.C.A. § 2254, Simpson filed this petition for a writ of habeas corpus in the district court on August 27, 1999. The district court denied the petition, and declined to issue a certificate of appealability under 28 U.S.C.A. § 2253. We

11

then granted a certificate of appealability to address Simpson's constitutional claims that (1) his death sentence violated the Confrontation Clause of the Sixth Amendment because the state trial court allowed the prosecution to cross-examine Dr. Coleman concerning the diagnoses and opinions of other providers; (2) his Eighth Amendment right to introduce evidence in mitigation was violated by the trial court's exclusion of certain testimony by Ms. Landreth; and (3) that his guilty plea was not knowing and voluntary. We now affirm.

## II.

Pursuant to the limits on federal habeas review of a state conviction, when a habeas petitioner's claim has been "adjudicated on the merits in State Court proceedings," we may not grant relief unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d); see also Williams v. Taylor, 529 U.S. 362 (2000). A state court's decision is contrary to clearly established federal law under § 2254(d) where it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court or "confronts a

set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent." Id. at 405-06. A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Factual determinations made by the state court "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West Supp. 2004). In cases where § 2254(d) provides no barrier to habeas relief and it is determined that a constitutional error occurred in the state court proceedings, the petitioner must also show "that the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" See Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

III.

A.

We begin with Simpson's claim that his Sixth Amendment right to confrontation was violated because the trial court permitted the prosecution to cross-examine his expert, Dr. Claudia Coleman, about

13

diagnoses and opinions of mental health professionals who had examined Simpson prior to the murder.

Dr. Coleman is an expert in clinical psychology, neurological psychology, and forensic psychology. She was retained in 1989, five years after the murder of Reverend Darter, to interview and evaluate Simpson for purposes of mitigation. Dr. Coleman reviewed Simpson's history, medical records, and social services records, and conducted a psychological examination. On direct examination, Dr. Coleman testified that, based upon her evaluation, it was her opinion that Simpson suffered from severe ADHD, and that this condition, left untreated, had resulted in destructive, aggressive, and disruptive behavior which was further exacerbated by Simpson's unstable social environment and a mixed personality disorder. As a result, Dr. Coleman opined that Simpson suffered from severe mental and emotional disturbances at the time of the murder and that his capacity to conform his conduct to the requirements of the law was impaired.

On cross-examination, the prosecutor questioned Dr. Coleman about the medical records and social services records that she had compiled, reviewed, and relied upon during the course of her evaluation and, in particular, questioned her about the diagnoses and opinions recorded by the physicians and psychologists in those records. Dr. Coleman acknowledged that she had relied upon information contained within the reports in formulating her expert

14

opinions, but testified that she disagreed with the information contained within them that contradicted her diagnosis of ADHD. The prosecution utilized this cross-examination to point out that none of the prior professionals had arrived at a diagnosis of ADHD and to suggest that the jury reject Dr. Coleman's opinions offered in mitigation.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. At the time of Simpson's third sentencing hearing, an unavailable hearsay declarant's statement was admissible "only if it [bore] adequate 'indicia of reliability.'" Ohio v. Roberts, 448 U.S. 56, 66 (1980). Reliability could be established if the evidence fell "within a firmly rooted hearsay exception" or if there was "a showing of particularized guarantees of trustworthiness." Id.[1]

On direct appeal, the North Carolina Supreme Court rejected Simpson's claim that the prosecution's cross-examination of Dr. Coleman "resulted in a violation of his constitutional right to confrontation," and held that "[p]ursuant to [North Carolina Rule

---

[1]In Crawford v. Washington, 124 S. Ct. 1354 (2004), the Supreme Court overruled Ohio v. Roberts, 448 U.S. 56 (1980). When the death sentence was imposed upon Simpson, however, Roberts was the controlling precedent. See Yarborough v. Alvardo, 124 S. Ct. 2140, 2147 (2004) ("For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by th[e] Court "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.") (internal quotation marks omitted).

15

of Evidence] 705, Dr. Coleman was properly cross-examined about other diagnoses contained within psychiatric reports upon which she relied, although she ultimately formed a differing diagnosis." Simpson, 462 S.E.2d at 213. In doing so, the state court noted that the case was indistinguishable from State v. Allen, 367 S.E.2d 626, 630-31 (N.C. 1988), which had held that such contrary opinions contained within the records and reports relied upon by an expert may be highlighted for the purpose of impeaching the expert.

On federal habeas, Simpson argues that the state court applied an improper evidentiary standard of review as evidenced by its reference to Allen and the absence of any explicit analysis as to whether the contrary opinions and diagnoses introduced via the cross-examination of Dr. Coleman fell "within a firmly rooted hearsay exception" or otherwise contained "particularized guarantees of trustworthiness" as required under Roberts. Consequently, he argues, the North Carolina court's adjudication of his claim was "contrary to" clearly established Supreme Court precedent, and that we should grant habeas relief because the opinions and diagnoses of the other mental health providers met neither of the exceptions set forth in Roberts.

We disagree. Although the North Carolina Supreme Court did not explicitly reference the Roberts inquiry, we cannot conclude from this omission that it rested its determination solely upon a conclusion that the cross-examination was appropriate under state

16

evidentiary rules. See Bell v. Cone, 125 S. Ct. 847, 853 (2005) (per curiam) (noting that "[f]ederal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation"). Nor can we otherwise conclude that the state court's adjudication of the constitutional claim resulted in a decision that was contrary to or an unreasonable application of the principles of Roberts.

Under the North Carolina Rules of Evidence, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing" and, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." N.C. Gen. Stat. § 8C-1, Rule 703. The expert is "required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion," if the adverse party requests, and "may in any event be required to disclose the underlying facts or data on cross-examination." N.C. Gen. Stat. § 8C-1, Rule 705.

Here, the North Carolina Supreme Court clearly identified the issue before it as a Confrontation Clause challenge to the admissibility of the underlying statements on cross-examination. Only then did it turn to a discussion of North Carolina's Rules of Evidence and its Allen decision. In Allen, the North Carolina

17

court had noted little distinction between the "reasonable reliance" standard articulated in North Carolina's rule of evidence governing expert testimony and the "inherently reliable" standard it had applied to such testimony prior to the adoption of the rule. And in State v. Huffstetler, 322 S.E.2d 110 (N.C. 1984), cited in Allen, the court had specifically rejected the defendant's contention that his Sixth Amendment "right to confront his accusers" was violated "because he could not cross examine the person who actually performed some of the tests" upon which the expert witness had relied. Id. at 119.

Under a fair reading of the North Carolina Supreme Court's decision in this case, and the Allen and Huffstetler cases cited therein, it is apparent that the North Carolina court was well aware of the Confrontation Clause claim before it, and followed its prior holdings that reports which are of the "type reasonably relied upon by experts in the particular field in forming opinions or inferences" are "inherently reliable." As such, they may be brought out by the proponent on direct examination, or by the adverse party on cross-examination, pursuant to Rule 703 or 705, without running afoul of the Confrontation Clause. We cannot say that this adjudication of Simpson's confrontation claim is contrary to Roberts simply because it referenced state evidentiary rules in the analysis, nor do we view its adjudication of the claim as

18

having resulted in a decision that was unreasonable in light of the governing Supreme Court precedents.[2]

B.

Simpson next argues that he is entitled to habeas relief because the state trial court excluded allegedly relevant mitigating evidence during the penalty phase of his trial, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Under the Eighth Amendment, juries may not be precluded from considering any relevant, mitigating "facets of the character and record of the individual offender" during capital sentencing proceedings. Skipper v. South Carolina, 476 U.S. 1, 8 (1986); see

---

[2]The State argued that Simpson's application for federal habeas relief should also be denied under § 2254(d) because it was not "clearly established" that the Confrontation Clause even applied to state capital sentencing proceedings when Simpson's death sentence became final in 1995. Compare Maynard v. Dixon, 943 F.2d 407, 414 n.5 (4th Cir. 1991); Bassette v. Thompson, 915 F.2d 932, 939 (4th Cir. 1990); with Proffitt v. Wainwright, 685 F.2d 1227, 1254 (11th Cir. 1982). The Supreme Court of North Carolina, however, has held that the Confrontation Clause applies to capital sentencing hearings, see State v. McLaughlin, 462 S.E.2d 1, 19 (N.C. 1995), and did not address or reject Simpson's Confrontation Clause claim based upon a holding that the right was inapplicable to capital sentencing proceedings. Because we conclude that the North Carolina court's denial of habeas relief on the merits of the Confrontation Clause issue was not contrary to or an unreasonable application of Supreme Court precedent pertaining to that Clause, we need not reach the question of whether it would also be appropriate to deny relief under § 2254(d) on the basis that it was not "clearly established" that the protections of the Confrontation Clause applied to the state sentencing proceedings at the time.

also <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 113-14 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, <u>as a matter of law</u>, any relevant mitigating evidence."); <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978) (holding that juries may "not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") (footnote omitted).

During the penalty phase of Simpson's trial, the prosecution presented overwhelming evidence of the brutal nature of this crime, not the least of which was Simpson's sixteen-page detailed confession of the events. Simpson's Eighth Amendment claim arises from limitations placed by the trial court upon the scope of the testimony offered by Simpson's social worker, Ms. Landreth.

Ms. Landreth's testimony regarding Simpson was derived from his foster care records and her personal interactions with him from the time that he was ten years old until he was seventeen years old. Specifically, she testified that Simpson was placed into the foster care system when he was ten days old, and that he remained there until he reached the age of majority. She offered extensive and detailed testimony regarding the difficulties that her office had in establishing a permanent plan for Simpson and the frequent relocations of Simpson within the foster care system, including

20

brief stays with his grandmother that did not work out for him and that were particularly disappointing to him.  She also testified regarding the effect these moves had upon his education and, in particular, testified that he developed academic and behavioral problems during this time period.

Ms. Landreth also provided testimony regarding Simpson's family history.  She testified that Simpson's older brother Joe, Jr., had been institutionalized, that Simpson's grandmother kept and raised his older brother Daryl, that his younger brother Anthony had been released to be adopted, and that his younger sister Charita was allowed to live with and be raised by their mother.  However, Ms. Landreth testified that neither of Simpson's parents wanted to release him for adoption.  She testified that Simpson was aware of the location of his siblings as he grew up, and that she and Simpson "often talked about his brothers and sisters and his family."  J.A. 144.  According to Ms. Landreth, Simpson "had a great deal of frustration and a great deal of lack of understanding about why his siblings could be raised by family members and he could not be."  J.A. 144.

Simpson's specific complaint stems from the trial court's refusal to allow Ms. Landreth also to testify that Simpson had been placed in foster care immediately upon his birth because his parents had severely abused his older brother Joe, Jr., and to allow Ms. Landreth to elaborate upon a conversation she had with

21

Simpson about the adoption decision made by his parents. On voir dire, Ms. Landreth testified that Simpson had a number of questions as to why he could not stay in one place, which led to discussions about adoption and his parents' unwillingness to give him up for adoption. However, Ms. Landreth testified that "[h]is reaction was not to not being adopted, but rather to not having a permanent place to stay, and his reactions ranged from being really sad and tearful to being very angry." J.A. 98. Simpson also takes issue with the trial court's refusal to allow Ms. Landreth, who had been qualified as an expert in child placement and permanency planning, to testify that Simpson was under the influence of mental and emotional disturbances as he grew up and that his ability to conform his conduct to the requirements of the law was impaired.

The state trial court ruled that Ms. Landreth could testify that Simpson was placed into foster care at birth and to testify without restriction "about any discussion she had about his being moved so many times and his reaction to that." J.A. 100. However, the court ruled that the abuse of Joe, Jr., prior to Simpson's birth was not relevant, mitigating evidence, and that Simpson's parents' refusal to release him for adoption was not admissible because this was something Ms. Landreth had told Simpson in response to questions he had asked about the lack of a permanent place to stay.

22

On direct appeal, the North Carolina Supreme Court rejected Simpson's claim with regard to the first two categories of evidence, holding that Ms. Landreth's additional testimony regarding Joe, Jr., and Simpson's parents was not relevant to the mitigation of Simpson's crime. With regard to the balance of the excluded testimony by Ms. Landreth, the North Carolina Supreme Court assumed, without deciding, that it was error for the trial court to exclude the evidence, but concluded that any error was harmless because the testimony would have been merely cumulative of Dr. Coleman's expert testimony.

On federal habeas review, we must deny relief if the North Carolina Supreme Court's adjudication of Simpson's Eighth Amendment claim resulted in a decision that was neither contrary to nor an unreasonable application of Supreme Court precedent. However, even if we assume that the excluded testimony of Ms. Landreth would have supported one or more of the mitigating circumstances Simpson offered to the jury, we must still deny habeas relief unless "the error had a 'substantial and injurious effect or influence in determining the jury's verdict,'" Fullwood, 290 F.3d at 679 (quoting Brecht, 507 U.S. at 637), or we are "in 'grave doubt' as to the harmlessness of [the] error," id. (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).

> In order for an error to have a substantial and injurious effect or influence, it must have affected the verdict. Because juries have a limited number of responses to give in a criminal trial--guilty, innocent, or cannot

23

decide--an error is harmless when the error did not substantially sway or substantially influence the response.

Thus, if the evidence is not merely sufficient, but so powerful, overwhelming, or cumulative that the error simply could not reasonably be said to have substantially swayed the jury's judgment, then the error is not harmful. On the other hand, if the federal court is in grave doubt about whether the trial error had a substantial and injurious effect or influence on the verdict and therefore finds itself in virtual equipoise about the issue, the error is not harmless.

Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (citations and internal quotation marks omitted).

In this case, the aggravating evidence supporting the imposition of the death sentence was quite compelling. According to Simpson's confession, which was consistent with the physical evidence, he and Eury approached Reverend Darter's home, accepted his hospitality and assistance, and then plotted and planned to return the next day to rob him. When they returned, Simpson forced his way into the home, attacked Reverend Darter, who was 92 years old at the time, strangled him with his bare hands while demanding money, and then strangled him with a belt that had been tied around his neck until it broke. He then tied a second, stronger belt around Reverend Darter's neck to strangle him, and used this belt to tie the Reverend's neck to the bedpost. To "finish him off," Simpson then beat Reverend Darter with a glass bottle until it broke and bloodied him and used a razor blade to slit the

24

Reverend's arms from his biceps to his wrists.  Simpson, 462 S.E.2d at 199.

Weighed against this aggravating evidence, Simpson advanced mitigating evidence that he had been raised since birth in a foster care setting, that he was never placed permanently with a foster family, and that as a result of this lack of permanency, he was mentally and emotionally impaired and had difficulty controlling his behavior.  Indeed, at the conclusion of the sentencing hearing, one or more jurors found, as mitigating circumstances, that Simpson committed the murder while under the influence of a mental or emotional disturbance, that his mental or emotional age was a mitigating circumstance, that his development was adversely affected by the lack of permanence in his life due to the frequent foster home and school placement changes, that he was taken into and then removed from the home and care of his grandmother during which time his brother, Daryl, continued to remain in the home and care of his grandmother, that he experienced mental or emotional disturbance beginning at an early age, that his mental or emotional disturbance adversely affected his ability to perform in school, and that his mental or emotional disturbance adversely affected his ability to sustain employment.

Having throughly reviewed the record in this case, it is clear that Simpson's jury was provided with substantial evidence of Simpson's unfortunate childhood and the problems he developed as a

25

result of his lack of a permanent home, yet unanimously found this background to be insufficient (even combined with six additional mitigating circumstances not related to his background) to outweigh the heinous nature of the murder of Reverend Darter. We are satisfied that the additional testimony of Ms. Landreth, excluded by the state trial court, would have added little to the factual description of Simpson's background, and that the North Carolina Supreme Court's holding that Ms. Landreth's opinion testimony, also excluded by the trial court, was largely cumulative of the opinions expressed by Dr. Coleman, a forensic psychologist that had been retained and qualified to evaluate and offer expert opinions regarding Simpson's mental and emotional status in the context of his background. In sum, given the strength of the aggravating evidence compared to the relative weakness of the admitted and excluded evidence offered in mitigation, we are confident that the exclusion of the additional testimony by Ms. Landreth did not have a substantial and injurious effect or influence on the outcome of the sentencing proceeding. Therefore, even if we assume that the state trial court's exclusion of the testimony violated Simpson's Eighth Amendment right to introduce relevant, mitigating evidence, he is not entitled to federal habeas relief as a result of the error.

C.

Simpson's final claim is that his plea of guilty was not given knowingly and voluntarily, as required by Godinez v. Moran, 509 U.S. 389 (1993).

It is well settled that "[a] criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently." Godinez, 509 U.S. at 396 (internal citation and quotation marks omitted). However, "[a] finding that a defendant is competent to stand trial . . . is not all that is necessary. . . . In addition to determining that a defendant who seeks to plead guilty . . . is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." Id. at 400; see also Brady v. United States, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). The competency inquiry focuses on "the defendant's mental capacity; the question is whether he has the ability to understand the proceedings." Godinez, 508 U.S. at 401 n.12. The "'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." Id. "The standard for determining

27

whether a guilty plea is constitutionally valid is whether the guilty plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.  In applying this standard, courts look to the totality of the circumstances surrounding the guilty plea, granting the defendant's solemn declaration of guilt a presumption of truthfulness."  Walton v. Angelone, 321 F.3d 442, 462 (4th Cir. 2003) (internal citation omitted).

As recounted above, Simpson confessed to the murder of Reverend Darter shortly after his arrest, describing in detail how he and Eury planned the crime, forced their way into the residence, and carried out the gruesome murder.  After unsuccessfully attempting to suppress the confession on the grounds that it was coerced, Simpson withdrew his plea of not guilty and entered a plea of guilty to first degree murder, conspiracy to commit murder, and armed robbery.  Under the plea agreement, Simpson reserved his right to appeal the state trial court's denial of his motion to suppress the confession and the prosecution agreed to dismiss the charge of first degree burglary.

On March 4, 1985, the state trial judge accepted Simpson's plea of guilty after questioning him twice concerning the voluntariness of the plea.[3]

---

[3]After engaging Simpson in the first series of questions, the trial court realized that he had forgotten to swear Simpson to tell the truth and repeated the colloquy a second time.

28

Q: Now Mr. Simpson, I will ask you again the various questions. Are you able to hear me and understand me?

A: Yes, sir.

. . . .

Q: Have you had time to talk to your lawyers about your cases?

A: Yes, sir.

Q: Are you satisfied with the services of your lawyer?

A: Yes, sir.

. . . .

Q: Have either of your lawyers done anything in representing you that you did not authorize them to do or did not approve of their doing?

A: No, sir.

Q: You understand that you are pleading guilty to murder in the first degree and conspiracy to commit murder and armed robbery?

A: Yes, sir.

Q: Do you understand these three charges?

A: Yes, sir.

Q: And that upon your plea of guilty that you could be sentenced to death or life imprisonment on the murder case?

A: Yes, sir.

Q: Either under the felony murder or the premeditated and deliberated murder, you understand that?

A: Yes, sir.

. . . .

29

Q:    Do you understand that you have the right to plead not guilty and be tried by a jury?

A:    Yes, sir.

Q:    And by pleading guilty that you waive certain rights that you have if you plead not guilty?

A:    Yes, sir.

Q:    How do you plead to this charge, guilty or not guilty?

A:    Guilty.

Q:    Are you in fact guilty?

A:    I am guilty.

Q:    You have heard what your lawyers said a minute ago about the plea arrangement, do you understand that?

A:    Yes, sir.

Q:    Except for what you lawyer said has anyone made any promises to you or threatened you in any way to influence you to plead guilty?

A:    No, sir.

Q:    Have you entered a plea of guilty to each of the charges of your own free will, knowing and understanding what you are doing ---

A:    Yes, sir, I am guilty.

Q:    ---And the consequences thereof?

A:    Yes, sir.

.  .  .  .

Q:    Do you have any questions or statement to make about what I have just said to you?

A:    No.

J.A. 36-39.

30

In 1997, Simpson filed his MAR in state court asserting that, notwithstanding this colloquy, his plea had not been entered knowingly and voluntarily. Specifically, Simpson claimed that "his mental and developmental condition caused by his chaotic upbringing prevented him from fully understanding what he was doing." J.A. 1207. Simpson also claimed that "he pled guilty based on a misunderstanding about the penalty and that he was pressured to plead guilty" by his attorneys. J.A. 1207.

The state MAR court held an evidentiary hearing on the claim, during which Simpson again presented the testimony of Ms. Landreth and Dr. Coleman, as well as testimony by Dr. Minta Saunders. Ms. Landreth testified that, in her opinion, Simpson's frequently changing foster care placements adversely affected his decision-making skills and caused him to be dependent upon authority figures for decision-making. Dr. Coleman testified that, based upon her evaluation in 1989, Simpson's ADHD had a moderate effect upon his ability to process, remember, and reflect upon information, and to consider, generate, and weigh alternatives. This effect, in turn, had "some negative influence on [his] decisionmaking capabilities" in 1985. J.A. 1131. She acknowledged, however, that she had not reviewed the plea colloquy from March of 1985 in formulating her opinion, and testified that she was only "asked the general question of whether or not [Simpson's] ADHD would affect his decision-making capabilities," not any "specific question" about

31

his plea hearing. J.A. 1134-35. Dr. Saunders, a clinical psychologist who evaluated Simpson and testified at his first sentencing hearing, opined that Simpson suffered from auditory problems, ADHD, and a borderline personality disorder that rendered him unable to make a knowing and voluntary plea.

Simpson's trial attorney also testified at the MAR hearing. In her view, Simpson appeared at times to have difficulty focusing, but she believed he understood her when she discussed the case. Although she testified that "there were times when . . . I don't think he heard a word that we said," she also pointed out that "there were other times when he would sit there and he was much calmer and we tried to talk to him and tell him what was going on and why we felt he should plead guilty, and I felt like he knew what we were saying. If I didn't, I wouldn't have pled him guilty at the time." J.A. 1103. Although counsel acknowledged having serious reservations at the time about recommending that Simpson plead guilty to the murder charge, they ultimately decided that it was the best option in view of the detailed confession.

Simpson also testified at the MAR hearing, asserting generally that he did not understand the implications of the guilty plea and that he only pled guilty because he thought he would avoid a death sentence by doing so. Simpson's specific testimony, however, reveals a great deal of understanding of the significance and consequences of his decision. For example, Simpson testified that

32

trial counsel advised him to plead guilty after their motion to suppress the confession had been denied. He testified that counsel discussed with him the fact that he could still appeal the denial of the motion to suppress. Simpson testified that counsel explained that:

> once I entered the guilty plea [the] only thing that probably could happen was the jury might would feel kind of sympathetic toward me. . . . [T]hey said I go in the courtroom and plead not guilty and the statement come up saying I'm guilty as sin, there's no way a jury believe nothing I got to say. That's what they said, "Your best bet go ahead and plead guilty and maybe things will work out that they might feel sympathetic for you and give you life."

J.A. 1015. In sum, Simpson admitted that he understood what the "defense strategy at the time was going to be by entering the guilty plea[] maybe the jury would have some mercy and sentence [him] to life in prison." J.A. 1015. Simpson testified that he understood that, after the guilty plea was entered, a jury would be chosen to hear the evidence and determine whether or not to impose a sentence of life or death and admitted that he was never told or informed by his attorneys that his plea of guilty would result in a life sentence rather than death.

In response, the state presented the testimony of Dr. Robert Rollins, a forensic psychiatrist who evaluated Simpson for competence to stand trial in 1984. It was Dr. Rollins' opinion that Simpson was competent to stand trial, that he had an understanding of his legal situation, and that he was able to

33

cooperate with his attorneys at the time. He diagnosed Simpson with a mixed personality disorder marked by antisocial and emotionally unstable features. He testified that he did not make a diagnosis of ADHD at the time, but felt that it was a reasonable one. Dr. Rollins also testified that, in preparation for the MAR hearing, he was asked to review the case and render an opinion as to whether Simpson was also competent to enter a guilty plea in March of 1985. Dr. Rollins testified that Simpson's ADHD would have had "some impairment of his overall function," but that based upon his assessment "it wouldn't be such to make him not competent." J.A. 1164. He further testified that, although he had no independent recollection as to whether Simpson "appeared to understand the questions that [he] asked of him back at that time period," he had noted in his report at the time an "opinion that Simpson was capable of understanding." J.A. 1165.

At the conclusion of the evidentiary hearing, and after examining the state court and MAR record, including the transcript of the plea and plea hearing, the state MAR court found that Simpson was competent to enter the plea of guilty, that he was not misled by his counsel, and that his plea was voluntarily, intelligently, and understandingly made in compliance with Godinez. The MAR court found unpersuasive Dr. Saunders' testimony that Simpson was not able to make a knowing decision, pointing out that Dr. Saunders was not present when Simpson was questioned or when he

34

entered the guilty plea.  Furthermore, Dr. Saunders did not review the transcript of the plea proceeding.  She also had not questioned Simpson about his understanding of the plea and, although her opinion regarding his decision-making abilities was based upon the information that was available to her and reviewed in March of 1985, she did not alert Simpson's attorneys of any such problem or talk to counsel at the time about Simpson's decision.

The state MAR court also found that Simpson's testimony at the evidentiary hearing demonstrated that he understood the strategy behind pleading guilty at the time, and that he understood the possibility that the jury might sentence him to death even if he pled guilty.  According to the findings of the state MAR court, Simpson knew that it was his decision to plead guilty, and "presented no credible evidence that [his attorneys] ever affirmatively told him he would receive a life sentence if he entered the plea of guilty to first-degree murder of Reverend Darter."  J.A. 1212.  The state court also found that:

> Simpson's sworn representations to Judge Rousseau in open court contradict his present allegations that he really did not understand the consequences of his guilty pleas, and that because of his severe mental and emotional disorders, he was unable to make an informed, knowing, and intelligent decision to enter the pleas.  Judge Rousseau carefully questioned Simpson twice about the guilty pleas, Simpson's condition at the time, the plea arrangement, Simpson's understanding of the charges and the consequences, Simpson's understanding that he still faced the possibility of the jury recommending a death sentence, Simpson's satisfaction with his attorneys, the constitutional right to a jury trial on guilt, and

35

whether Simpson entered the pleas of his own free will, understanding what he was doing.

J.A. 1212. Finally, the court observed that, despite the neurological, mental, and emotional disorders which affected his decisionmaking skills, it appeared that "Simpson could handle most of the practical aspects of daily living," and "was able to communicate with people and respond appropriately to questions." J.A. 1209. Hence, the court concluded that Simpson had failed to show that, despite his in-court representations, he was not able to and did not knowingly and voluntarily enter the pleas of guilty.

> The evidence on which Simpson relies is primarily Dr. Saunders' opinions and the testimony from Dr. Coleman and Ms. Landreth concerning Simpson's limited decision-making skills. . . . Dr. Saunders did not take into account what was actually said or explained to Simpson before his plea or the actual Court proceedings when he pled guilty. Even accepting Dr. Coleman's and Ms. Landreth's testimony concerning Simpson's limitations, that does not necessarily mean that on March 4, 1985, Simpson did not know what he was doing. The persuasive evidence from the people who were there is that Simpson understood what he was doing.

J.A. 1213.

We hold that the state MAR court reasonably concluded that the evidence failed to support an assertion that Simpson did not enter his plea knowingly and voluntarily. Simpson's own testimony revealed that, although hindsight and three death sentences now tell him that he had nothing to lose by going to trial on the murder charge, he was aware of what he was doing when he pled guilty to the murder of Reverend Darter, understood why he was

36

doing it and what he hoped to gain by doing it, and understood the risks and possible outcomes of that decision. Simpson has failed to demonstrate, by clear and convincing evidence, that the factual determinations made by the state MAR court on this issue are not entitled to a presumption of correctness, see 28 U.S.C.A. § 2254(e)(1), that the state court's factual determinations were unreasonable in light of the evidence presented in those proceedings, or that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law, see 28 U.S.C.A. § 2254(d).

## IV.

For the foregoing reasons, we affirm the district court's denial of Simpson's petition for writ of habeas corpus.

AFFIRMED